**Z.A.O., INC. f/k/a Bell Thunderbird Oil Co., Inc., Appellant,**

v.

**YARBROUGH DRIVE CENTER JOINT VENTURE, Appellee.**

No. 08–99–00083–CV.

Court of Appeals of Texas, El Paso.

Feb. 8, 2001.

---

Steven C. James, El Paso, for appellant.

Bruce Koehler, Steven L. Hughes, Mounce, Green, Myers, Safi & Galatzan, P.C., El Paso, for appellee.

Before BARAJAS, C.J., McCLURE, and CHEW, JJ.

## OPINION

BARAJAS, Justice.

This is an appeal from a judgment entered against Z.A.O., Inc. for breach of contract, nuisance, and trespass. For reasons stated below, we affirm in part, reverse and render in part, and reverse and remand in part.

## I. SUMMARY OF THE EVIDENCE

### A. Factual History

In 1990, Yarbrough Drive Center Joint Venture, ("Yarbrough"), leased premises

located in El Paso, Texas to Z.A.O., Inc., ("ZAO"), for use as a service/gas station. The 1993 lease agreement provided that the lease would end on March 31, 1994. On March 21, 1994, Bart Colwell, manager of Yarbrough, agreed to extend the lease to September 30, 1994.

At some point prior to the expiration of the lease, (i.e. September 30, 1994), ZAO abandoned the lease.[1] After several failed attempts to encourage Eugene Bell, president of ZAO, to clean up the premises and to finalize all obligations under the lease agreement, William Mounce, Yarbrough's attorney, in a letter dated July 25, 1994, informed ZAO that in spite of the abandonment, it remained liable for rent payments in the amount specified in the lease through September 30, 1994.[2] The letter also contained the following notices:

> On termination of the lease you are obligated to remove all improvements including the underground storage tanks, pursuant to Section 4.01(b) of the lease. Your attention is also invited to Section 10.09 of the lease agreement. Yarbrough ... demands that you continue to pay the rental provided in the lease. You must also make arrangements with Yarbrough ... to comply with Section 4.01(b) of the lease agreement.

Section 4.01 of the lease is entitled "Maintenance and Surrender." That section states:

> Lessee shall at its expense and risk, maintain the roof, foundations, underground or otherwise concealed plumbing, and the structural soundness of the exterior walls and all other parts of the building and other improvements on the Leased Premises in good repair and

condition, including but not limited to repairs (including all necessary replacements) to the interior plumbing, windows, window glass, plate glass, doors, heating system, air conditioning equipment, fire protection sprinkler system, and the interior of the building in general; and including the reasonable care of landscaping and regular mowing of any grass, and maintenance of paving outside the building.

> Lessee shall, throughout the lease term, take good care of the building and other improvements and keep them free from waste or nuisance, and, upon termination of this Lease, shall remove all improvements including the underground storage tanks. Lessee shall restore the premises to level, hard-surfaced, without holes, and suitable for use as a parking space and without any separation barriers between the Leased property and the Lessor's property (reasonable wear and tear and damage by fire, tornado or other casualty excepted.) Lessee agrees to indemnify and hold Lessor harmless from any and all claims, demands, losses or expenses asserted against or suffered by Lessor as a result of any hazardous or toxic substances located in or under the soil of the Leased Premises.

In a letter dated September 28, 1994, Eugene Bell responded to the July 25 letter. Bell informed Colwell that he was enclosing $5,280 as full payment of his financial obligations under the lease and that he had contacted the Texas Water Commission in order to make arrangements for the removal of the storage tanks.[3] Bell indicated that he was waiting

---

**1.** Bart Colwell testified that the abandonment occurred in June 1994.

**2.** Colwell testified that the June 1994 rent payment was tendered timely. However, rent

for the months of July, August, and September were not paid.

**3.** Colwell admitted during trial that after Bell received the July 25 letter, ZAO paid rents for July, August, and September. However, they

for certain paperwork from the Commission before he would remove the tanks. Yarbrough's attorney, James Jones, responded to Bell's letter in a letter dated October 10, 1994. Jones informed Bell that Bell did not have to wait for any paperwork prior to removing the tanks, and that Yarbrough was requesting removal as soon as possible.

By November of 1994, ZAO completed the removal of the tanks. However, they had not completed the re-paving process due to rain delays. In a December 1994 letter, Jones informed Bell that all of the necessary restoration had not been completed and that until such restoration was completed, Yarbrough considered Bell to be in breach of the lease. The letter also indicated that "[t]he premises have not been returned to their original condition as is required by the lease." By the end of December 1994 or the beginning of January 1995, ZAO completed re-paving the parking lot in accordance with the lease provisions. After ZAO repaved the premises, the Texas Natural Resource Conservation Commission issued a letter dated January 6, 1995 to Leonard Durling, the manager of the gas station. The letter informed ZAO that a "release" from the storage tanks had occurred.[4] The letter also stated that:

> Title 30, Texas Administrative Code (TAC), Section 334.71—334.85 requires the owner or operator of a storage tank system to immediately abate any release of a regulated substance and to conduct an investigation for soil and groundwater cleanup.

. . .

> If assessment activities reveal the presence of any phase-separated hydrocarbons (PSH), then you are required, pursuant to 30 TAC 334.79, to immediately implement a recovery program which effectively removes the PSH . . . to the maximum extent practicable and to notify this Office immediately.

Because the Commission's letter mentioned the word "owner," in June or July of 1995, Colwell hired Raba–Kistner, an independent consulting firm, to conduct soil testing on the property.[5]

During the trial, James Williams, manager of geosciences for Raba Kistner, testified about the testing process that occurred on the effected site. During his testimony, the following exchange took place between him and Yarbrough's counsel:

> Question: Now, would you tell the Ladies and Gentlemen of the Jury—describe the analysis that was performed by you, or by your company at the site?
>
> Answer: We analyzed the soil samples using the organic vapor analyzer while we were on the site. And then from the laboratory we requested total petroleum hydrocarbons and BTEX along with which they analyzed for MTBE.
>
> Question: And what is MTBE?
>
> Answer: Methyl tert-Butyl Ether.
>
> Question: Is that a toxic and hazardous substance?
>
> Answer: Yes, it is.

---

failed to pay the requested $300 in attorney's fees which Colwell claimed were due under the lease provisions.

**4.** A "release" refers to the existence of a possible contaminant in the soil.

**5.** Colwell testified that the total expenses incurred for the independent environmental tests was approximately $4,000.

Question: Is TPH—well, first of all, what is TPH?

Answer: TPH includes all total petroleum hydrocarbons. So that could include everything from asphalt through gasoline, methane, your natural gas, those are all petroleum hydrocarbons.

Question: At the action levels that you found, were those hazardous and dangerous substances?

Answer: Yes, we believe that there was a gasoline and/or diesel release, and those concentrations would be hazardous and toxic.

ZAO also hired an environmental specialist to perform tests on the site in accordance with the notice provided by the Commission. ZAO's specialist, Vincent Lahay, testified that the site contained 78 times the action level for gasoline, and 15.6 times the action level for diesel.[6]

After ZAO and Yarbrough tested the soil on the site, ZAO submitted to the Commission a site closure proposal. Then, in a letter dated June 3, 1997, the Commission issued a site closure letter to ZAO which stated the following:

This letter confirms the completion of corrective action requirements for the release incident at the above-referenced facility. Based upon the submitted information and with the provision that the documentation provided to this agency was accurate and representative of site conditions, we concur with your recommendation that the site has met the closure requirements. This letter documents that no further corrective action is necessary.

Please be aware that case closure is based on identified exposure pathways and that remaining contaminant levels

and potential exposure pathways should be evaluated when conducting any future soil excavation or construction activities at this site. Please ensure that any wastes generated from these activities are handled in compliance with all applicable regulations.

The information submitted by ZAO to which the closure letter referred failed to indicate that the property would be used as a restaurant in the future. This omission becomes important considering the testimony of James Williams regarding the effects of future site development on Yarbrough's potential liability for the toxic substances. Williams testified that if, during the course of future development, workers come into contact with the toxic substances, then Yarbrough will be obligated to take corrective action. Once such corrective action is undertaken by Yarbrough, they could be considered to be the responsible party by the Commission.

## B. Procedural History

Yarbrough filed its First Amended Original Petition on January 11, 1995. Yarbrough claimed that it suffered damages attributable to (1) the failure to timely pay rent; (2) the failure to keep the facility open to the public for the duration of the lease; (3) the failure to return the leased premises in the proper condition under the lease; and (4) the failure to pay holdover rent. In its Fourth Amended Original Petition, Yarbrough asserted the following causes of action: (1) breach of contract; (2) negligence; (3) negligence per se; (4) misrepresentation; (5) fraud; (6) nuisance; (7) trespass; and (8) gross negligence.

At the conclusion of the trial, the jury was asked the following questions: (1) Did

6. Lahay also explained that an action level is the point where you either have to clean up

the property or seek some kind of site closure.

Bell Thunderbird Oil Company fail to comply with its obligations under the Lease Agreement? (2) Did Bell Thunderbird Oil Company commit a trespass onto the property that was a proximate cause of damages to Yarbrough Drive Center Joint Venture? (3) Did Bell Thunderbird Oil Company commit a nuisance on the property that was a proximate cause of damages to Yarbrough Drive Center Joint Venture? (4) Do you find that the trespass and/or nuisance by Bell Thunderbird Oil Company was committed with malice? After answering "No" to the first question, and "Yes" to each of the remaining questions, the trial court entered a judgment against ZAO for the following amounts: $129,160.52 for actual damages; $53,150.16 for prejudgment interest; $14,028.03 for attorney's fees through trial; and $44,000 in exemplary damages. Thunderbird now brings this appeal.

## II. *DISCUSSION*

### A. Legal and Factual Sufficiency Challenges to the Theories of Recovery

In Issue One, Appellant challenges the legal and factual sufficiency of the evidence with respect to allegations of trespass, nuisance, breach of contract, and/or malice. We begin with a discussion of the appropriate legal and factual standards of review.

### 1. Standards of Review

█ In considering a "no evidence" legal insufficiency point, we consider only the evidence that tends to support the jury's finding and disregard all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965). If there is more than a scintilla of evidence to support the questioned finding, the "no evidence" point fails. *Mexico's Industries v. Banco Mexico Somex*, 858 S.W.2d 577, 580–81 (Tex.App.—El Paso 1993, writ de-

nied); *U.S. Fire Ins. Co. v. Ramos*, 863 S.W.2d 534, 538 (Tex.App.—El Paso 1993, writ denied).

█ A factual insufficiency point requires us to examine all of the evidence in determining whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (Tex.1951); *Oechsner v. Ameritrust Texas, N.A.*, 840 S.W.2d 131, 136 (Tex.App.—El Paso 1992, writ denied); *Chandler v. Chandler*, 842 S.W.2d 829, 832–33 (Tex.App.—El Paso 1992, writ denied). The reviewing court cannot substitute its conclusions for those of the jury. If there is sufficient competent evidence of probative force to support the finding, it must be sustained. *Oechsner*, 840 S.W.2d at 136; *Chandler*, 842 S.W.2d at 833. It is not within the province of the court to interfere with the jury's resolution of conflicts in the evidence or to pass on the weight or credibility of the witnesses' testimony. *Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792 (Tex. 1951). Where there is conflicting evidence, the jury's verdict on such matters is generally regarded as conclusive. *Montgomery Ward & Co. v. Scharrenbeck*, 146 Tex. 153, 204 S.W.2d 508 (1947); *Oechsner*, 840 S.W.2d at 136; *Chandler*, 842 S.W.2d at 833.

### 2. Breach of Contract

Appellant maintains that the jury's determination that Appellant breached the agreement it had with Appellee cannot be upheld because (1) "[t]here was no evidence presented at all about the original condition of the site," and (2) "[t]here is no contractual requirement in the lease that Bell Thunderbird actually clean up any mild contamination, whether hazardous or not ... [t]here is no statement that the property be returned to its original condi-

tion in the lease." We begin with Appellant's first contention.

■ Although it is the position of Appellee that the lease does not necessarily require Appellant to be the source of the pollutants in order to be liable, Appellee contends that the jury heard sufficient evidence from which it could have reasonably inferred that the source of the contaminants in the soil came from Appellant's operations. We agree. The most telling piece of evidence suggesting that Appellant is the cause of the pollution came in the form of testimony from James Williams. Williams testified that MTBE, one of the toxic substances found in the leased premises, was not commonly available until the early or mid 1980's. Because Appellant began its operations in 1981, the MTBE toxins are very likely to be attributable to its operations as opposed to that of any predecessor gas station. This evidence is sufficient to overcome a no-evidence challenge, as it constitutes more than a scintilla of evidence. With regard to Appellant's factual sufficiency challenge, the only evidence Appellant introduced to defeat this finding was testimony from Bell that when he began the operations in 1981, he did not conduct soil testing to determine the extent of any preexisting pollutants which may have been attributable to previous gas station operators. Because this evidence merely suggests that there is a possibility that the pollutants may have been caused by a previous operator, it is not sufficient to support a determination that the jury's conclusion was against the great weight and preponderance of the evidence. We overrule Appellant's factual and legal sufficiency challenges with respect to the jury's determination that Appellant breached the lease agreement. We now turn to Appellant's contention that the lease agreement does not require it to remove all toxic substances in the absence of a third-party claim having been asserted against Appellee.

■ Appellant contends that Section 4.01(b) of the lease agreement cannot be interpreted as requiring it to return the leased property in a toxic-free condition. Appellant argues that Section 4.01(b) is simply an indemnity clause that was never triggered in this case because no third-party claims have been asserted against Appellee. Appellee counters these contentions by arguing that Section 4.01(b) of the lease agreement triggers several contractual duties, in addition to indemnification. Specifically, Appellee argues:

> Subsection (b) is stated in the disjunctive, and thus contains multiple obligations. ZAO agreed not only to 'indemnify ... Lessor ... from any and all claims, demands, [or] losses ... asserted against ... Lessor as a result of any hazardous or toxic substances located in or under the soil or the leased premises'. ZAO also agreed in Subsection (b) to 'hold Lessor harmless from any and all ... expenses ... suffered by Lessor as a result of any hazardous or toxic substances located in or under the soil of the leased premises'. Subsection (b) contemplated more than indemnification from third-party claims; it also obligated ZAO to protect YDC from any expenses arising from hazardous substances remaining on the property after the lease terminated.

■ The dual interpretations of Section 4.01(b) raise the issue of contract ambiguity. Although neither side raised the issue of ambiguity in the pleadings, a court may nevertheless conclude that the contract was ambiguous in the absence of such pleadings. *See Sage Street Associates v. Northdale Construction Co.,* 863 S.W.2d 438, 445 (Tex.1993). If the court determines that the contract was ambiguous,

then the factual issue of the parties' intent in forming the agreement will control. *See id.* at 444–45. If the issue of intent was not given directly to the jury, such as in this case, then the jury's response to the damages issue may be dispositive of the fact issue pertaining to the parties' intent if the issue of intent was tried by consent. *See id.* at 444–45. If the issue was tried by consent, then, on appeal, the proper manner to attack the jury's implied findings on the meaning of the contract is by challenging the sufficiency of the evidence. Because Appellant placed its argument that the contract does not require it to remove all toxic substances under the heading, "There Is No Or Insufficient Evidence Of Breach Contract," we will assume that Appellant has raised a factual and legal sufficiency challenge to the jury's implied finding that Section 4.01(b) was intended to mean that which Appellee argues. Before we can address this challenge, however, we must determine (1) whether the contract is ambiguous, and (2) whether the issue of parties' intent was tried by consent.

We begin by determining whether the contract in this case was ambiguous.

> Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered. A contract is not ambiguous if it can be given a definite or certain meaning as a matter of law. On the other hand, if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, which creates a fact issue on the parties' intent. An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract. For an ambiguity to exist, both interpretations must be reasonable.

*Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587 (Tex.1996) (citations omitted). Thus, in order for us to reach a determination as to whether the contract is ambiguous, we must ascertain whether it is subject to multiple reasonable interpretations. Appellant interprets Section 4.01(b) of the lease agreement as imposing liability only if a third-party claim is asserted against Appellee pertaining to the toxic substances remaining in the leased premises. Appellee interprets the section as requiring Appellant to return the leased premises in a toxic-free condition regardless of whether any third-party claims have been filed. The disputed portion of Section 4.01(b) of the lease agreement states: "Lessee agrees to indemnify and hold Lessor harmless from any and all claims, demands, losses or expenses asserted against or suffered by Lessor as a result of any hazardous or toxic substances located in or under the soil of the Leased Premises." Appellant's interpretation of the clause is certainly reasonable, particularly when read in the following manner: "Lessee agrees to indemnify . . . from any claims . . . asserted against . . . Lessor." We must now determine whether Appellee's interpretation is reasonable. Although the word "indemnify" is not defined in the lease agreement, the legal term is commonly understood to mean the following:

> To restore the victim of a loss, in whole or in part, by payment, repair, or replacement. To save harmless; to secure against loss or damage; to give security for the reimbursement of a person in case of an anticipated loss falling upon him. To make good; to compensate; to make reimbursement to one of a loss already incurred by him.

BLACK's LAW DICTIONARY 769 (6th ed.1990). Based on this fairly broad definition, Sec-

tion 4.01(b) could be read in the following manner: "Lessee agrees to [reimburse] ... any and all losses or expenses ... suffered by Lessor." When construed in this manner, Appellee's interpretation of Section 4.01(b) in not unreasonable. Thus, we conclude that Section 4.01(b) is an ambiguous provision.

■ Once a contract is determined to be ambiguous, the intended meaning of the contract becomes an issue of fact for the jury to decide. *See Sage Street Associates,* 863 S.W.2d at 445. We must determine whether this fact issue was subsumed in the jury's answer to the damages questions which were resolved in favor of Appellee. In other words, we must determine whether the fact issue of the parties' intended meaning of Section 4.01(b) was tried by consent.

"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Tex.R. Civ. P. 67. Without objection, Appellee introduced the following evidence pertaining to its theory of the intended meaning of Section 4.01(b): (1) testimony from Bell that under the lease agreement, he was responsible for "the cleanup of any toxic substance;" (2) testimony from Bell that under the lease, he is "responsible for any and all hazardous or toxic substances;" and (3) a letter from Bell to Colwell, in which Bell stated: "Once we receive the necessary paperwork, we will then remove our tanks, equipment and restore the property to its original condition." The introduction of this testimony without objection supports our determination that the issue of the parties' intended meaning of Section 4.01(b) was tried by consent.

Because Section 4.01(b) of the lease agreement is ambiguous, and because the intended meaning of the contract was tried by consent, we hold that the jury's determination that Appellant breached the agreement renders the fact issue of intent as having been resolved in favor of Appellee's interpretation of the agreement. We are now in a posture to entertain Appellant's factual and legal sufficiency to this finding.

The evidence listed above is certainly sufficient to defeat Appellant's legal sufficiency challenge, as it constitutes more than a scintilla of evidence that both parties contemplated the complete removal of toxic substances. With regard to Appellant's factual sufficiency challenge, although no objection was raised to Appellee's evidence regarding the parties intended meaning, we have not located, nor has Appellant identified, any evidence which was introduced in support of Appellant's interpretation of the agreement. Thus, we cannot conclude that the jury's determination that the parties intended Appellee's interpretation is against the great weight and preponderance of the evidence. Accordingly, we overrule that portion of Appellant's Issue One which challenges the jury's determination that the lease agreement required it to remove the toxic substances.

### 3. Malice

■ Appellant argues that the evidence is factually and legally insufficient to support the jury's determination that he committed acts of trespass and/or nuisance maliciously. Specifically, Appellant contends that "there is no proof of an extreme degree of risk." Appellee contends that the jury heard sufficient evidence to justify the imposition of exemplary damages, including (1) Bell's admissions that the site contained contaminations; (2) Bell's acknowledgment that Appellant had a responsibility to restore the property to its

original condition; and (3) Appellant's failure to remove the toxins.

The Texas Legislature has provided the following definition of "malice:"

> [A] specific intent by the defendant to cause substantial injury to the claimant; or an act or omission which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(7) (Vernon 1997).[7] At least one court has commented on the degree of risk associated with the Legislature's use of the term "extreme:" "The 'extreme risk'· prong is not satisfied by a remote possibility of injury or even a high probability of minor harm, but rather 'the likelihood of serious injury' to the plaintiff." *Federal Deposit Ins. Corp. v. Schreiner, III.,* 892 F.Supp. 869, 877 (W.D.Tex.1995) (citing *Wal–Mart v. Alexander,* 868 S.W.2d 322, 326, 327 (Tex.1993)). Here, no evidence was introduced suggesting that such a severe injury could reasonably be anticipated due to the actions or omissions of Appellant. Because the evidence cited by Appellee does not constitute more than a scintilla of evidence of the type of extreme degree danger contemplated by the Legislature, we sustain that portion of Appellant's Issue One to the extent that it challenges the legal sufficiency of the evidence that it acted maliciously.

#### 4. Nuisance

 Appellant argues that the evidence is insufficient to support the jury's determination that it committed a nuisance because (1) there is no evidence suggesting Appellant (as opposed to the previous station operators) caused the pollution; and (2) there is no evidence of a condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities. Appellee argues that the evidence supports a finding that Appellant committed a nuisance because "[t]he presence of the MTBE, along with other evidence indicating that ZAO had spilled gasoline into the soil over the years, was evidence that ZAO caused the encroachment of dangerous substances on YDCs' property." Appellee also argues that the existence of the pollutants substantially interfered with its use of the property because after the pollution, the property could only be used as a parking lot.

 In Texas, nuisance involves "a condition which substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it." *Watson v. Brazos Elec. Power Coop., Inc.,* 918 S.W.2d 639, 644 (Tex.App.—Waco 1996, writ denied).

> A nuisance may occur in one of three different ways: (1) physical harm to property, such as encroachment of a damaging substance or by the property's destruction; (2) physical harm to a person on his or her property, such as by an assault to his or her senses or by other personal injury; and (3) emotional harm to a person from the deprivation of the enjoyment of his or her property, such as by fear, apprehension, offense, or loss of peace of mind.

7. This definition is identical to that which was given to the jury in this case.

*Cain v. Rust Industrial Cleaning Services, Inc.,* 969 S.W.2d 464, 470 (Tex.App.—Texarkana 1998, writ denied) (citing *Ward v. Northeast Texas Farmers Co-op. Elevator,* 909 S.W.2d 143, 151 (Tex.App.—Texarkana 1995, writ denied); and *Maranatha Temple, Inc. v. Enterprise Products Co.,* 893 S.W.2d 92 (Tex.App.—Houston [1st Dist.] 1994, writ denied)). For an actionable nuisance, a defendant must generally engage in one of three kinds of activity: "(1) intentional invasion of another's interests; (2) negligent invasion of another's interests; or (3) other conduct, culpable because abnormal and out of place in its surroundings, that invades another's interests." *Hicks v. Humble Oil & Refining Co.,* 970 S.W.2d 90, 96 (Tex.App.—Houston [14th Dist.] 1998, writ denied) (citing *Watson,* 918 S.W.2d at 644).

In its Fourth Amended Original Petition, Appellee alleged that Appellants acted either negligently or intentionally. Appellee has produced no evidence, however, of negligent or intentional encroachment. Furthermore, the fact that Appellant and Appellee have made appropriate contractual provisions to address the occurrence of spillage demonstrates the degree to which the parties anticipated the possible occurrence of the complained of activity. This, of course, defeats any possible finding that Appellant's conduct in causing any leakage was somehow out of place in its surroundings. We sustain that portion of Appellant's Issue One to the extent that it challenges the legal sufficiency of the evidence that Appellant caused a nuisance.

### 5. Trespass

 Finally, in Issue One, Appellant additionally challenges the factual and legal sufficiency of the evidence with respect to the jury's determination that it committed a trespass. The jury was given the following definition of "trespass:" " 'TRESPASS' means entering, or causing other persons or things to enter, another's property without the owner's consent."

We find *Taco Cabana, Inc. v. Exxon Corp.,* 5 S.W.3d 773 (Tex.App.—San Antonio 1999, writ denied) to be instructive. There, Exxon leased a tract of land from the owner for the purpose of subleasing it for use as a gas station. When the lease expired, Exxon closed the station and cleared the lot. Subsequently, Taco Cabana acquired the tract. While Taco Cabana was constructing a restaurant on the site formerly used as a gas station, it detected toxic substances in the ground. The substances did not exceed state action levels. After Taco Cabana detected the substances, Exxon was provided a letter from the Texas Natural Resource Conservation Commission indicating that no further remedial activity was needed in order to clean the site. Taco Cabana then sued Exxon under several theories of recovery, including trespass. After the jury determined that Exxon had committed a trespass and was negligent per se, the trial court granted a directed verdict in favor of Exxon because there was no evidence to sustain the jury's findings. Taco Cabana appealed. The San Antonio Court of Appeals had this to say with respect to Taco Cabana's trespass cause of action:

Taco Cabana's reliance on section 158, which speaks to failing to remove from the land something which Exxon was under a duty to remove, begs the question of the duty. We turn again to the applicable regulations to answer this question. To the extent that any common law duties regarding removal of contamination existed, such duties have been displaced by the Water Code and implementing administrative regulations because the Legislature has delegated to the TWC the task of determining appropriate cleanup standards. *See Ryan v. Travelers Ins. Co.,* 715 S.W.2d 172, 175

(Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.) (where common law is revised by statute, statute controls); *see also Bullock v. Electro–Science Investors, Inc.,* 533 S.W.2d 892, 894–95 (Tex. Civ.App.—Austin 1976, no writ) (where rights do not exist at common law, statute creating right controls). The statutes in place dictate when corrective action is necessary. Thus, 'unreasonable levels' of contaminants on the land would be levels which exceeded state action levels. Because the evidence presented at trial did not establish that Exxon failed to remove soil that contained contaminants above state action levels, Taco Cabana failed to establish its trespass theory of liability.

*Id.* at 780. Thus, the court determined that because the State of Texas determined the level of contaminants to be not unreasonable, a private cause of action for trespass could not be maintained. We agree with the sound reasoning of the San Antonio Court of Appeals. Here, Appellant was given a notice from the State which indicated that any contaminants which existed did not rise to an actionable level.[8] Thus, because the Legislature has set the standard which governs common law trespass causes of action, we hold that Appellee has not proven that Appellant breached a duty. We sustain that portion of Appellant's Issue One to the extent that it challenges the legal sufficiency of the evidence that Appellant committed an actionable trespass.[9]

## B. Challenges to the Damage Award

The trial court entered judgment in the following amounts: $129,160.52 for actual damages; $53,150.16 for prejudgment interest; $14,028.03 for attorney's fees; and $44,000 for exemplary damages. The actual damage award includes the following: $11,131.52 to restore the leased premises to its original condition; $110,000 for loss of fair market rental value of the property sustained in the past; $5,000 for loss of fair market rental value in the future; and $3,029 for the costs associated with testing the soil. Appellant raises several arguments attacking these figures.

### 1. Scope of Recovery

In Issue Two, Appellant argues that the judgment is based on an improper measure of damages. In support of this proposition, Appellant cites *Siegler v. Robinson,* 600 S.W.2d 382 (Tex.Civ.App.— Houston [1st Dist.] 1980, writ ref'd n.r.e.) where the court held that when there are no permanent damages, "the landlord is entitled to the reasonable cost of repairs as the proper measure of damages if he waits until after the term of the lease has." *Id.* at 386 (citing *Whitworth Estate v. Mangels of Texas, Inc.,* 363 S.W.2d 851 (Tex.Civ.App.—Waco 1962, no writ); and *Baroid Division, National Lead Company v. Early,* 390 S.W.2d 866 (Tex.Civ. App.—Eastland 1965, no writ)). We find *Siegler* to be distinguishable from the present case insofar as in *Siegler,* the lessor did not seek recovery for loss of rentals. The *Siegler* court was only presented with the issue of whether the proper measure of damages attributable to a tenant's failure to restore the premises is (1) the decrease in market value of the reversion; or (2) the cost of repair. Thus, the *Siegler* court made no determination as to

---

8. The Texas Natural Resource Conservation Commission's letter to ZAO stated, "This letter documents that no further corrective action is necessary."

9. Given our disposition of Issue One, we need not address Appellant's Issue Six, that: "As a matter of law, the Joint Venture is not entitled to recover on tort theories for its breach of contract case."

whether lost rental value suffered as a result of the tenant's breach was recoverable.

Appellant also cites *Nielson v. Okies,* 503 S.W.2d 614 (Tex.Civ.App.—El Paso 1973, no writ), where this court stated: "[W]here damaged property is susceptible of repairs, the owner may recover reasonable costs of such replacements and repairs as are necessary to restore damaged property to its condition immediately prior to the injury." *Id.* at 616 (citing *Pasadena State Bank v. Isaac,* 149 Tex. 47, 228 S.W.2d 127 (1950); and *Hill & Hill Truck Line, Inc. v. Powell,* 319 S.W.2d 128 (Tex. Civ.App.—Waco 1958, no writ)). We find *Nielson* to be likewise distinguishable from the present case. The issue in *Nielson* was whether the lessor was entitled to recover the full estimate of the cost of repairs when the actual repair costs were a fraction of the estimate. The lessor in that case simply did not seek further damages for any loss attributable to the time the premises could not be leased due to the tenant's breach.

Finally, Appellant cites *Dunlap v. Mars Plumbing Supply Co.,* 504 S.W.2d 917 (Tex.Civ.App.—San Antonio 1973, no writ), where a landlord sued his tenant to recover damages to the premises. As in this case, the lease agreement required the tenant to return the property in good repair. After the trial court awarded the landlord $4,800 for repair costs, the tenant challenged the legal sufficiency of the evidence to support the award. Prior to addressing the tenant's specific argument, the *Dunlap* court confirmed that "[i]t is settled that where the tenant fails to discharge his obligation to return the property in good condition, the landlord may recover as the measure of damages the reasonable cost of repairs to place the property in the obligated condition." *Id.* at 918. Again, we find *Dunlap* to be distinguishable from the case at bar. In *Dunlap,* the court was tasked with deciding whether the trial court erred when it admitted testimony of the decrease in market value of the lessor's property due to the tenant's breach. After noting that the proper measure of damages was cost of repair, the trial court concluded that no reversible error occurred because the difference in market value figure was consistent with the cost of repairs. Thus, *Dunlap* simply does not address the issue of whether loss of rentals suffered in the past (and/or future) due to a tenant's failure to return the property in a restored condition are recoverable.

In Texas, the scope of recoverable damages associated with damage to property depends upon whether the injury is temporary or permanent in nature.[10] *See Lone Star Development Corp. v. Reilly,* 656 S.W.2d 521, 525 (Tex.App.—Dallas 1983, writ ref'd n.r.e.).

> If an injury to property is temporary in nature, the proper measure of damages is the reasonable cost of the repairs necessary to restore the property to its condition immediately prior to the injury plus the loss occasioned by being deprived of the use of the property.... It has been repeatedly held that loss of rentals is an appropriate measure of damages for the temporary loss of the use of land.

*Id.* at 525–26 (citing *Bradley v. McIntyre,* 373 S.W.2d 389, 391 (Tex.Civ.App.—Houston 1963, writ ref'd n.r.e.); *City of Austin v. Teague,* 570 S.W.2d 389, 394 (Tex.1978);

---

**10.** Appellant does not argue that the injury in this case is permanent so as to distinguish this body of case law. Indeed, Appellant seems to concede that the injury is, in fact, temporary when it made the following comment in its brief: "[Appellee] did not prove a permanent injury to this site."

*Parker v. McGinnes*, 594 S.W.2d 550, 552 (Tex.Civ.App.—Waco 1980, no writ); and *F.H. Vahlsing, Inc., v. Harrell*, 248 S.W.2d 762, 773 (Tex.Civ.App.—San Antonio 1952, writ ref'd n.r.e.)). " 'Stated differently, the proper measure of damages for a temporary injury to real property is the amount necessary to place the owner of the property in the same position he occupied prior to the injury.' " *Id.* at 526 (quoting *Kraft v. Langford*, 565 S.W.2d 223, 227 (Tex.1978)). Thus, because Appellee was entitled to be put in the same position it was in prior to the breach, we conclude that the categories of damages Appellee was awarded are not impermissible given the nature of the injury in this case. Appellant's Issue Two is overruled in its entirety.

### 2. Loss of Fair Market Rental Value Suffered in the Past

In Issue Three, Appellant contends that there is no evidence or insufficient evidence to support the elements of actual damages awarded. Appellant first argues that there was no evidence presented at trial to sustain an award for loss of market rental value in the past. Appellee argues, however, that the testimony of Bart Colwell that Appellee "lost a probable tenant for the property at $2,500 per month net rent, the fair market rental value of the property, due to the use restrictions on the property," constitutes legally sufficient evidence of the award for loss of fair market rental value in the past. At trial, the following exchange took place between Colwell and Appellee's trial counsel:

Question: What is the current fair market rental value of this property?

Answer: About $2,500 a month, net.

Question: What do you mean by that?

Answer: I mean, $2,500 a month paid to the owner and the tenant pays all expenses, taxes, insurance.

Question: What do you base that figure of a fair market rental value of $2,500 a month?

Answer: Well, the best evidence is that I had a tenant ready to lease this property when I finally got it cleared.

Question: And in those discussions, did you discuss the possible rental value, the amount to be paid by that tenant?

Answer: Yes, we did.

Question: And who was that tenant?

Answer: Pistol Pete's Pizza.

Question: And are you familiar with the fair market rental value of other properties like that on the east side of El Paso, Texas?

Answer: Well, generally, yes. I mean, I know what I was leasing it to Bell for under a very old lease. I know that typically land will rent for about eight percent of it's value. I know what we are doing in the center. I know what we have discussed with other potential tenants through the years.

We must determine whether this testimony is legally sufficient to support the award of $110,000 of lost rentals suffered in the past.[11] In *City of Austin v. Teague*, 570 S.W.2d 389, 394–95 (Tex.1978), the Texas Supreme Court defined "rental value" as " 'that amount which, in the ordinary course of business, the premises would bring or for which they could be rented, or the value, as ascertained by proof of what the premises would rent for, and not the probable profit which might accrue.' " (quoting 76 C.J.S. *Rental* at 1168 (1952)). The Court went on to discuss the rule regarding the level or degree of cer-

11. Presumably, the jury calculated this amount based on Colwell's testimony that (1) the fair market rental value of the property is $2,500 per month, and (2) Yarbrough has been unable to collect rent on the property for three and a half years.

tainty the evidence used to support the award of lost past rentals must be in order to be upheld on appeal. After referring to the well-established rule pertaining to claims for lost profits, the Court held: "It is not enough that profits merely be anticipated or hoped for; they must be established with reasonable certainty ... anticipated rentals from land that is presently undeveloped is just as speculative and uncertain as measuring anticipated profits from a presently unestablished business." *Id.* at 395.[12] This passage demonstrates the Court's reluctance to uphold damage awards in the absence of reasonably certain and reliable testimony. Here, the only testimony the jury heard with respect to the value of the rentals was the comments made by Colwell pertaining to the current value of the land (assuming it could be turned into a restaurant from its current parking lot status). There was no indication that the $2,500 figure represented an accurate assessment of the land's rental value for the duration of the period the land could not be rented due to Appellant's breach. Indeed, Colwell's testimony even specified that the $2,500 figure represented the *current* rental value of the property. There was no testimony as to whether the property could have been rented for $2,500 per month dating back to the time of the breach. We agree with Appellant that there is legally insufficient evidence to sustain the award of $110,000 for loss of rental value suffered in the past. Issue Three is sustained to the extent it challenges the award for loss of fair market rental value in the past.[13]

### 3. Loss of Future Fair Market Rental Value

■ In Issue Three, Appellant also challenges the legal and factual sufficiency of the $5,000 award for loss of future fair market rental value. Appellant argues that the only evidence introduced at trial with regard to the duration of the clean-up procedure suggested that the site could be restored to its original condition in approximately one day. Our review of the record indicates that Appellee introduced no evidence to suggest that it would take two days, let alone two months to restore the property.[14] Accordingly, we sustain Appellant's legal sufficiency challenge to the $5,000 award for loss of fair market rental value in the future. Issue Three is sustained to the extent it challenges the

12. With regard to the lost profit analysis, we recently stated that what constitutes reasonably certain evidence of lost profits is a fact intensive determination. As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. *See Holt Atherton Industries, Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992). A plaintiff must demonstrate one complete calculation of lost profits. *See id.* at 85. Moreover, to recover lost profits, a party must show either a history of profitability or the actual existence of future contracts from which lost profits can be calculated with reasonable certainty. *See Allied Bank West Loop v.. C.B.D. & Associates,* 728 S.W.2d 49, 54–55 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.). The correct measure of damages for lost profits is net profits. *Turner v. PV*

*Int'l Corp.,* 765 S.W.2d 455, 465 (Tex.App.—Dallas 1988), *writ denied per curiam,* 778 S.W.2d 865 (Tex.1989).

13. Given our disposition of this portion of Issue Three, we need not address Issue Five that: "The damages awarded are against the great weight and preponderance of the evidence due to the failure of the landlord to make a reasonable effort to mitigate its damages."

14. Presumably, the jury determined that the future losses would be $5,000 based on Colwell's testimony that the current rental value of the property is $2,500 per month. Thus, the jury must have estimated the duration of the clean-up effort to be two months.

award for loss of fair market rental value in the future.

### 4. Cost of Testing the Soil

Finally in Issue Three, Appellant argues that the award for the cost of testing the soil should be overturned because there is insufficient evidence that such costs were reasonable and that such tests were necessary. We disagree. The jury was presented with extensive testimony from Williams regarding the types of tests that were conducted, as well as the reasonableness of the costs. Accordingly, we overrule Appellant's sufficiency challenge to the award for testing costs. This portion of Issue Three is overruled.

### 5. Cost of Repair

█ In Issue Four, Appellant argues that the award for cost of repairs should be reversed because (1) the evidence is legally and factually insufficient to sustain the award for cost of repair because there was no evidence of the exact condition of the property when Appellants signed the lease; and (2) there was no evidence that the repairs were necessary and reasonable. With regard to Appellant's first contention, the jury impliedly decided that Appellee and Appellant intended the ambiguous lease provision to require Appellant to remove all of the toxic substances. Thus, whether there was proof of the level of contaminants at the time the lease was executed is irrelevant. With regard to Appellant's argument that the cost of repairs award was erroneous due to the lack of evidence suggesting the repairs were reasonable and necessary, Appellant cites *Ebby Halliday Real Estate, Inc. v. Murnan*, 916 S.W.2d 585, 589 (Tex.App.—Fort Worth 1996, writ denied) where the court held that in order "[t]o establish the right to recover costs of repair, it is not necessary for a claimant to use the words 'rea-

sonable' and 'necessary'; a claimant need only present sufficient evidence to justify a jury's finding that the costs were reasonable and the repairs necessary." (citing *Ron Craft Chevrolet, Inc. v. Davis*, 836 S.W.2d 672, 677 (Tex.App.—El Paso 1992, writ denied)). Even assuming this rule of law applies in this breach of contract cause of action, Appellee satisfied the standard announced in *Murnan* through the introduction of the testimony of Williams. Williams testified that if one were to come into contact with the pollutants found on Appellee's premises, "[i]t could make you—it could make you ill through breathing the vapors, through dermal contact, getting it on you." Appellee also introduced the Raba–Kistner report which indicated that the estimated cost of removing all of the toxins was $11,131.52. The report clearly and meticulously assigned a separate value to each of the well documented and lucidly explained activities which must be performed in order to fully clean the property. This evidence certainly establishes that the costs were reasonable and the repairs were necessary. Notably, Appellant does not point to a single item in the report as being unnecessary or over estimated. Rather, Appellant makes the blanket statement that none of the repairs were needed. We overrule Appellant's Issue Four.

### 6. Broad Form Damages Submission

█ Having determined (1) that the evidence is sufficient to sustain the jury's determination that Appellant breached the lease agreement; (2) there is legally insufficient evidence to sustain the jury's determination that Appellant acted maliciously; (3) there is legally insufficient evidence of nuisance; and (4) there is legally insufficient evidence of trespass, we now turn to Appellant's Issue Eight, that the trial court erred in submitting a broad form damages question. Appellant contends

that a recent Texas Supreme Court case requires us to reverse and remand the case based on the fact that the damages question submitted to the jury did not require the jury to allocate the damages among the various causes of action.

Citing *Crown Life Insurance Company v. Casteel,* 22 S.W.3d 378 (Tex.2000), Appellant argues that if we reverse the trial court's judgment with respect to the nuisance and trespass causes of action, then we cannot sustain the damages award for the breach of contract finding because we do not know the exact amount of damages the jury attributed to the breach, as opposed to the trespass and/or nuisance. Appellant's reliance on *Casteel,* however, is misplaced. In *Casteel,* an insurance agent sued the insurance company for which he sold insurance policies for various statutory violations. After instructing the jury as to thirteen independent grounds of recovery, five of which included DTPA causes of action, the court submitted a single question on *liability.* The jury then determined that the insurance company was liable to the agent—presumably under at least one of the thirteen causes of action on which they were instructed. The Texas Supreme Court determined that, although the agent had standing under the Texas Insurance Code to sue the insurance company, he had no standing to allege DTPA violations. Thus, the trial court erroneously included the five DTPA causes of action in the list of violations. The Texas Supreme Court determined that the error was harmful because "[t]he best the [appellate] court can do is determine that some evidence could have supported the jury's conclusion on a legally valid theory." *Id.* at 388. Thus, the basis for the Court's determination that the error was harmful was the fact that the appellate court could not be sure on which of several possible theories the jury premised liability. Here, such is not the case. The jury was given

separate liability questions on breach of contract, trespass, and nuisance. Although we have determined that the trespass and nuisance findings lack sufficient evidence, we are not left wondering on which of several theories of liability the jury based its award. The only remaining theory is breach of contract, which the jury resolved in favor of Appellee in a separate question. Thus, we find this case to be distinguishable from *Casteel.*

This case is much more analogous to *Automobile Insurance Company of Hartford Connecticut v. Davila,* 805 S.W.2d 897 (Tex.App.—Corpus Christi 1991, writ denied), where the jury was provided with two separate liability questions, one for a DTPA violation, and one for breach of good faith and fair dealings. The jury was given only one damages question premised on a finding of either a breach of good faith and fair dealing or the DTPA violation. After the court of appeals determined that the plaintiff could not recover under the DTPA cause of action, the court held:

> When there are favorable jury findings on an alternative theory, a judgment can be upheld on that alternative theory once a DTPA theory is reversed on appeal. In this case, the judgment can be upheld by the jury findings regarding a breach of good faith and fair dealing and the measure of damages are the same under either cause of action, remand of the DTPA cause of action is not warranted.

*Id.* at 903. In the present case, the measure of damages for the tort causes of action and for the breach of contract cause of action are the same. Our reversal of the tort causes of action does not require us to reverse the damage award because it is supportable under the breach of contract theory.

Furthermore, as a practical matter, the jury's determination that Appellant committed a trespass and a nuisance necessarily required the jury to find that Appellant left the toxic substances in the ground. That finding alone satisfies the breach of contract cause of action. Thus, even if the jury premised the damage award solely on the torts, they necessarily determined that Appellant also breached the contract. Because there is sufficient evidence to sustain the breach of contract cause of action, we affirm the damages award based on the breach alone. Issue Eight is overruled.

### C. Attorney's Fees

In Issue Seven, Appellant argues that since Joint Venture did not segregate its attorney's fees between tort and contract causes of action, it is not entitled to recover attorney's fees as a matter of law. Specifically, Appellant argues that the $14,028.53 award for attorney's fees should be reversed and remanded for a determination of the amounts attributable to the contract cause of action and the amounts attributable to the torts causes of action because the trial court erroneously granted attorney's fees without requiring Appellee to segregate the amounts spent on each cause of action.

Appellee was entitled to recover their attorney's fees under the contract and pursuant to TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (Vernon 1997).[15] However, attorney's fees are not recoverable in tort actions. *Huddleston v. Pace,* 790 S.W.2d 47, 49 (Tex.App.—San Antonio 1990, writ denied). Generally, it is incumbent upon the party seeking to recover attorney's fees to offer evidence of fees associated with the causes of action for which attorney's fees may be recovered.

*See Stewart Title Guaranty Co. v. Sterling,* 822 S.W.2d 1, 10–11 (Tex.1991). "[A]n award of attorney's fees erroneously based upon evidence of unsegregated fees requires a remand." *Id.* at 11 (citing *International Security Life Ins. Co. v. Finck,* 496 S.W.2d 544, 546–47 (Tex.1973)). "A recognized exception to this duty to segregate arises when the attorney's fees rendered are in connection with claims arising out of the same transaction and are so interrelated that their 'prosecution or defense entails proof or denial of essentially the same facts.'" *Id.* at 11 (quoting *Flint & Assoc. v. Intercontinental Pipe & Steel, Inc.,* 739 S.W.2d 622, 624–25 (Tex. App.—Dallas 1987, writ denied)).

"The standard of review for an award of attorney's fees on the basis of breach of contract is abuse of discretion." *AU Pharmaceutical, Inc. v. Boston,* 986 S.W.2d 331, 337 (Tex.App.—Texarkana 1999, no writ) (citing *Pyles v. United Servs.Auto. Ass'n,* 804 S.W.2d 163, 164 (Tex.App.—Houston [14th Dist.] 1991, writ denied); and *City of Austin v. Janowski,* 825 S.W.2d 786, 788 (Tex.App.—Austin 1992, no writ)). "The test for abuse of discretion is whether the trial court's decision was arbitrary or unreasonable." *Id.* at 337 (citing *Pyles,* 804 S.W.2d at 164). "A trial court's actions are unreasonable only if the court acted without reference to any guiding rules and principles." *Id.* at 337 (citing *Janowski,* 825 S.W.2d at 788). "If an award of attorney's fees is erroneously based upon evidence of unsegregated fees, the case must be remanded for more evidence on the issue." *Id.* at 337 (citing *Aetna Cas. and Surety v. Wild,* 944 S.W.2d 37, 41 (Tex.App.—Amarillo 1997, writ denied)).

Appellee argues that its breach of contract cause of action was inseparable from

---

**15.** Section 38.001 states: "A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for: ... (8) an oral or written contract."

its trespass and nuisance cause of action. We disagree. As noted above, the nuisance cause of action required proof of either negligent or intentional culpable conduct of Appellant, neither of which relates to Appellee's breach of contract cause of action. Similarly, Appellee's trespass cause of action required proof of an unreasonable level of intrusive toxins—an element not associated with Appellee's breach of contract cause of action. Thus, because Appellee's tort causes of action required proof of elements which were wholly unrelated to its breach of contract claim, we sustain Issue Seven, reverse the award of attorney's fees and remand that issue for segregation. *See AU Pharmaceutical,* 986 S.W.2d at 337 (reversing the award of attorney's fees because "Boston's tort causes of action entailed proof of facts unnecessary for proof of their contract claim.").

### D. Disposition

We affirm the judgment with respect to Appellee's breach of contract claims. We reverse and render judgment with respect to the trespass, malice, and nuisance claims. We reverse and render judgment with respect to the damages awarded for loss of fair market rental value suffered in the past ($110,000) and future ($5,000). We sustain the damage awarded for the cost of repair ($11,131.52) and the cost of testing ($3,029). We reverse the attorney's fees award ($14,028.03) and remand that issue for a determination of the segregation issue. We reverse the interest award ($53,150.16) and remand that issue for a correct calculation based on our disposition of the damages.[16]

---

16. This complaint was raised in Issue Nine.