**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-24-00305-CV**
_____

**SAPRAMJEET SINGH, Appellant**

**V.**

**TANWEER AHMED AND SARWAT AHMED, Appellees**

On Appeal from the 457th District Court
Montgomery County, Texas
Trial Cause No. 22-11-14788-CV

**MEMORANDUM OPINION**

Sapramjeet "Jack" Singh ("Singh" or "Plaintiff") sued Tanweer Ahmed ("Ahmed" or "Defendant") and Sarwat Ahmed (collectively "the Ahmeds" or "Defendants") over Singh's 2021 purchase of Defendants' home. Singh alleged damages, claiming that he relied to his detriment on Defendants' fraudulent misrepresentations about the condition of the property. Although Singh initially pleaded claims under the Texas Deceptive Trade Practices Act ("DTPA"), common

1

law fraud, statutory fraud in a real estate transaction, civil conspiracy, and negligence, he abandoned the civil conspiracy and part of his negligence claims during trial.

At the close of Singh's case, the Ahmeds moved for a directed verdict, citing the lack of evidence of material misrepresentation, reliance, or damages. The trial court granted the Ahmeds' motion as to all Singh's remaining causes of action, explaining that Singh had not shown justifiable reliance, causation, or damages. Singh appealed, arguing that the record contained legally sufficient evidence to support his claims, and in the alternative, that the trial court erred in limiting the testimony of an expert witness who could have provided evidence of causation and damages. We affirm the trial court's judgment.

## BACKGROUND

The Ahmeds were the original owners of the house, which was built in 2011. In May 2021, the Ahmeds sold the property to Singh, but when additional bulkhead problems became apparent, as did issues with the pool and retaining wall, Singh sued the Ahmeds alleging that the Ahmeds fraudulently concealed the damage. We summarize the pertinent evidence below.

<u>Singh's Testimony</u>

Singh testified that he was a real estate broker, and that on May 21, 2021, he purchased the Ahmeds' property as an investment. The purchase price was

$1,600,000 and the transaction included both the real property and a boat that Ahmed purchased for nearly $100,000. Referring to the seller's disclosure, a document which "conveys anything that the previous owners know about the property at the time of sale or at the time of contract[,]" Singh testified that the Ahmeds disclosed no defects in most of the property's systems, including the retaining wall. Although the seller's disclosure stated that the generator needed a battery, Ahmed told Singh that it instead needed "an automatic starter switch." Ahmed also informed Singh before the closing date that during Hurricane Harvey, a palm tree fell into the canal, causing the bulkhead to "bulge out[,]" but that information was not included on the seller's disclosure. Ahmed told Singh that he thought the bulkhead repairs would cost about $50,000 to $60,000, which was why Ahmed included the boat in the sale.

After learning that the bulkhead needed "a little repair[,]" as Ahmed phrased it, but before the sale closed, Singh had his property manager assess the damage. The project manager "saw the little piece of bulkhead that was pushed out[,]" but thought the damage was "nothing that stands out [] of the ordinary." According to Singh, when Singh told Ahmed that he planned to have the property inspected, Ahmed replied that he had an inspection report and provided that report to Singh. Singh testified that he relied on that report and the seller's disclosure and that he would not have bought the property if Ahmed had disclosed the issues with the pool, retaining wall, and bulkhead. Although Singh could not locate that report, he recalled

3

that Ahmed stated that he "was going through a divorce and he needed to speed things up, and so here's an inspection report, there's no issues with the house, and that's what I relied on." Singh stated that the report "did not show anything that would cause any alarms."

Singh described the spatial relationship between the bulkhead and retention wall, stating, "[t]he retention wall sits on top of the bulkhead." Singh further stated that the "entire bulkhead on this side is covered by a deck," so that "[y]ou cannot see the bulkhead . . . [or] the retention wall. It's all hidden." According to Singh, Ahmed told him that "he just installed a brand-new deck because the previous deck flew away because of the storm [Hurricane Harvey]. There is no way to test, to check that bulkhead, what it was behind that deck or the stairs that were built." Since Ahmed purportedly told Singh that he installed a new deck "after the storm," Singh surmised that Ahmed replaced the deck "maybe a year before [the sale], perhaps."

Singh first became concerned about structural issues with the property when the pool began losing water because some of the pipes had cracked "due to shifting." The repair estimate was $150,000. When Singh noticed that the patio had separated from the dwelling, a condition that was not present when he bought the property, Singh called some contractors, including Kimberly Munsinger. Singh and the contractors discussed Singh's concerns, including why the back patio seemed to be sloping toward the water. Singh learned that "the retention wall that was not

4

supposed to be built on a bulkhead had no tiebacks, and that wall was leaning further into – against the home, which was causing a major drift, and so it was eroding underneath the patio." As Singh described the situation, "the sidewalk had dropped three and a half feet below. Soil was missing underneath. Even the – the garage, there was – the garage slab, there was soil missing underneath that. Electrical wires, gutters, everything was stretched, rebars were sticking out." In Singh's opinion, "this had to be going on before. It's – it's not something – like, there's no soil underneath the flatwork. That soil was getting out somehow over a period of years." It was Singh's understanding that the damage was due to "[e]rosion, wrong soil, definitely, and a poorly designed retention wall." Singh testified that he sold the property in August 2023 because he "couldn't take the headache any longer. It was too much to handle, too many surprises[.]"

Ahmed's Testimony

Ahmed testified that he worked with a builder to build the house as a custom home. Since Ahmed is "not an expert to design the house[,]" he gave the builder his specifications and let the builder and DTS Engineering ("DTS") design the house. According to Ahmed, DTS's design was used to build the retaining wall and DaRam Engineering's design was used for the pool. Ahmed denied knowing Munsinger and that he asked her for an estimate to repair the bulkhead. Ahmed further denied that

5

anyone from Lake Conroe Marine Construction inspected the bulkhead and advised him that the bulkhead and retaining wall were failing.

When asked about the inspection report, Ahmed stated that the report was generated "probably in January of 2021[]" by a potential buyer who made an offer on the property and ordered the report. Since that potential buyer could not obtain financing, the sale was not completed. In addition, Ahmed recalled that the inspection report addressed only the house, not the retaining wall. Also, Ahmed stated that he no longer had the report, having given it to Singh.

Ahmed acknowledged that some items on his Seller's Disclosure Notice were inaccurate. Specifically, Ahmed testified that although his Seller's Disclosure Notice reflects no bulkhead, retaining wall, or pool decking damage, and states that the generator needed a battery, there was such damage and the generator needed something other than a battery. Ahmed, however, testified that he believed the generator needed only a battery. Ahmed also acknowledged having received an inspection report within the previous four years despite having denied it on his disclosure notice and that he had made an insurance claim for damage after Hurricane Harvey struck the property in 2017. Ahmed further testified that he replaced the composite decking after Hurricane Harvey but that was the only repair work done.

Kimberly Munsinger's Testimony

Munsinger testified that she worked for Lake Conroe Marine Construction, a company specializing in bulkheads, boathouses, and docks. Munsinger estimated that she had worked for Lake Conroe Marine Construction for eight or nine years as of the time of trial and had examined "several hundred" bulkheads per year during that time.

Specifically referencing the property that is the subject of this suit, Munsinger recalled that she first inspected the approximately 200-foot bulkhead sometime between 2019 and 2021 because the Ahmeds wanted a repair estimate for it. When Munsinger evaluated the Ahmeds' bulkhead, she observed that "the bulkhead on the canal side was – was pushing out, and it's a wood bulkhead and you could tell there was deterioration[.]" While visiting the Ahmeds' property, Munsinger also saw cracks in the concrete. Munsinger accordingly told the Ahmeds of her findings, prepared a repair estimate, and told the Ahmeds. She could not, however, recall the dollar amount of her estimate.

Munsinger could not recall when Singh first called her but stated that it was after August 2021. During Munsinger's second visit to the property, she noticed that "[t]he cracks were significantly more and wider[]" and "the pushout of the bulkhead had increased at that time."

When deciding whether to admit Munsinger's expert testimony about the extent and cost of needed bulkhead repairs, the trial court heard this testimony and the parties' respective arguments regarding its admissibility outside the jury's presence. Munsinger testified that a new wall should have been installed in front of the original wall and the gap between the two walls filled with stabilized sand at a cost of approximately $400,000 to $500,000. Munsinger wrote an estimate and gave it to the Ahmeds but no longer had a copy of her estimate. Munsinger also testified that she told the Ahmeds "that the bulkhead was failing, that the bulkhead was not properly installed, and that if they didn't do something about it right then, it was going to get worse." According to Singh's attorney, Munsinger also would have testified that if the Ahmeds had properly addressed the problem, it "more than likely could have been stopped[,]" and that Munsinger could see that "there had been work done on the bulkhead to mitigate" the damage.

John Gultek's Testimony

Gultek testified that he was a structural engineer with over twenty-five years of experience in that field. He has owned DTS Engineering since 2000. Gultek testified that although DTS designed the house, worked with the builder, Calibre Homes, and he visited the property more than once, he never met or spoke to the Ahmeds. DTS also "did a design for the retaining wall[,]" but did not do any design work for the bulkhead, since it preexisted the other structures on the property.

8

According to Gultek, the Ahmeds did not use the retaining wall design that DTS created but instead used a design "by another engineering company." Gultek added that DTS did not design the pool, the decking, or the stairway, and that he did not know when they were installed. He confirmed that the decking and stairway covered the bulkhead so that "you cannot observe the condition of the bulkhead."

Gultek recalled that Singh contacted DTS in 2022. DTS assessed the issues with the property, created a design to remedy those issues, and performed "some work" at the property.

Documentary Evidence

- Photographs of the damage to the property, taken in July, September, and December 2022, and March 2024, damage that was not present when Singh bought the property in 2021;

- Structural drawings for the property;

- DTS Engineering, Inc.'s disclaimer (unsigned), dated January 22, 2010;

- Deeds, contracts and disclosures regarding the property, showing that Singh bought the property "as is" and that "[s]oil conditions vary greatly throughout Texas[,]" and that soil may move;

- Pool repair contract (unsigned), dated December 16, 2021, showing a contract amount of $144,000;

- Lake Conroe Marine Construction LLC's bulkhead repair estimate/contract (unsigned), dated July 18, 2022, showing a price of $510,000;

- Appraisal, showing that Montgomery County appraised the property at $2,275,910 in 2022;

- Text message exchanges regarding bulkhead and foundation.

  The initial message, from April 2021, states: I have to disclose you that it needs little repair on the side bulk head. May cost close to $60k.

  To be honest with you, I have to pay agent 3%. My payoff is $1525k.

  I will give you my boat which I bought for $97K and it has barely 4 hours on it. It's a 15 seater boat.

  So net net is you can pay my loan off and take boat too. If it comes even less than $1.6 I am fine[.]
  . . . .
  On April 14, 2021, Singh messaged Ahmed, stating: Uncle ji good morning is it ok if our contractor comes to look at the bulkheads at 10:30? He won't need to go inside.
  . . . .
  In June 2022, Singh messaged Ahmed asking who poured the foundation, claiming that the foundation was the cause of the problems with the deck and bulkhead area.

The Trial Court's Docket Control Order

The trial court signed its Docket Control Order ("DCO") on September 15, 2023. The DCO requires expert witness designations at least 150 days prior to trial (trial was set for June 3, 2024) as follows:

A list shall be filed which includes each expert's name, address, telephone number, the subject of the testimony, and the opinions that will be proffered by each expert. **Experts not listed in compliance with this paragraph will not be permitted to testify absent a showing of an exception under Rule 193.6.** A Rule 195 disclosure is not a substitute for this filed designation.

The deadline to designate experts under the DCO was then January 12, 2024. The DCO does not distinguish between retained and non-retained experts.

Singh's initial witness list, filed September 1, 2023, does not list Munsinger as a witness. Singh filed a new witness list on September 5, 2023, listing Munsinger with her contact information but not including the subject of Munsinger's testimony or her opinions.

Singh served his Amended Initial Disclosures on the Ahmeds on April 24, 2024. In this document, Singh identified Munsinger, provided her contact information, and stated, "Witness hired by Defendants; informed Defendants of the sever[e] problems with the bulkhead, etc. that Defendants misrepresented; provided Plaintiff with repair estimate[.]" Singh's expert designation was also served on April 24, 2024, and designated Munsinger with the following description of her testimony:

> Ms. Munsinger is a contractor who specializes in bulkhead repairs and replacements. She also has knowledge as to the condition of the bulkhead on the property both before Plaintiff's purchase of the Property and after as she has examined the property and examined the damages made the basis of this case. Therefore, Ms. Munsinger has knowledge of relevant facts regarding Plaintiff's claim and the damages made the basis of this suit.
>
> She will testify as to the scope of reasonable and necessary repairs to the bulkhead on the property and the cause of the damages. The report for the scope of the reasonable and necessary repairs to the property and the cause of the damages on which she will testify is attached.

11

Ms. Munsinger has reviewed or may review all expert reports, repair estimates, photographs, and documents produced by Defendants. Ms. Munsinger also inspected the property.

Ms. Munsinger's findings, observations, results, mental impressions, opinions and conclusions may be supplemented within a reasonable time following receipt of additional documents or data, if any, from Defendant and or its experts.

With regard to the report referenced above, what was attached to the disclosure was the repair estimate, dated July 18, 2022 from the company Munsinger worked for in 2022, which was two years after the sale of the home from the Ahmeds to Singh. Nowhere in the report does it talk about the prior condition of the bulkheading from 2019 to 2021, even though the designation stated that Munsinger also had knowledge as to the condition of the bulkhead on the property before Singh's purchase. More importantly, the report doesn't talk about what Munsinger saw or her impressions back in her 2022 visits. Everything that is disclosed and included in the report is from her subsequent visits when Singh owned the property. The trial court deemed the repair estimate was deficient in several ways as an expert report, especially on lost value at the time of Singh's sale of the home.

The trial court excluded Munsinger's expert testimony ruling that Munsinger was not properly designated as an expert according to the terms of the DCO. The trial court did, however, permit Munsinger to testify as a fact witness.

The Directed Verdict

After Singh rested his case, the Ahmeds moved for a directed verdict in their favor on the grounds that there was no evidence of (1) actionable conduct under the DTPA; (2) Singh's reliance; (3) Ahmeds' material misrepresentation; or (4) Singh's damages. In support of this motion, the Ahmeds argued that they disclosed what they knew at the time of the sale, which was "what the law require[d]." Singh responded that the Ahmeds' comments were jury questions rather than grounds for a directed verdict. Singh further argued that according to Munsinger, the retaining wall repair would cost approximately $510,000, to which the trial court replied, "that was not admitted before the jury and I didn't hear her say it was reasonably – reasonable and necessary." The court continued:

> Which was never said it was reasonable and necessary. So reasonable and necessary costs need to be proven up. So you can't have – like, a typical – you don't need reasonable and necessary if you're doing like painting a wall or a minor repair, but a bulkhead repair, you would need the testimony that it's reasonable and necessary. A lay witness cannot testify to that damage amount.
>
> . . . .
> I am going to grant the directed verdict on all causes of action, and here's my findings.
>
> First, let's go with – we'll start with the damages. He was using a subsequent sale. First of all, I think that in a damage – a case like this, you have the choice of permanent or temporary. Temporary, and by the testimony of Ms. Munsinger -- it was during the voir dire testimony – we learned that she was out on the property back in 2019, 2020, or 2021 – she couldn't remember when – and she did say that it could be repaired. So this is a temporary injury, not a permanent injury, that

13

could be repaired. Gultek said the similar thing but that was also in the offer of proof, both requiring expert testimony to give those opinions. So this is a temporary injury, not a permanent injury, so you have no damages. The temporary amount was less than the permanent amount, so you have to go with the less amount, anyway. So 500's less than $700,000 and change. Even if we did go with that, there's Barry v. Jackson, 309 S.W.3d 135, that gives us the rule on a subsequent sale and when you're going to do that. This was over two years from the closing dates, and to do that, you have to adjust for market conditions. I heard no testimony from Mr. Singh that during that time, he took account for the fluctuations in market conditions, that this was a reasonable time after the injury came. So I don't think it was a reasonable calculation of damages under that case law.

Second, reliance, this is the killer. Your case is done on this case, on this alone, and this is – let me get that case for you. There's two cases, Supreme Court cases. Mercedes-Benz USA versus Carduco, Inc., 219 Westlaw 847-845. There's JPMorgan Chase Bank versus Orca Assets, G.P., 546 S.W.3d 648, Texas 2018, and it says an essential element of a fraud claim, and all these claims, justify – that the plaintiff justifiably relied on the alleged misrepresentations or nondisclosures. Usually it's a fact question, but it may be negated as a matter of law, and the circumstance there was sophisticated buyer and red flags.

Here, it's all there. We have a sophisticated buyer. He's a real estate developer. We have red flags. He's told there's an issue with the bulkhead. This is all prior to closing. This is not in dispute. He is told there's an issue to the bulkhead. Whether it's misrepresentation, partial representation or not, the text message says $60,000. It may be $60,000. Mr. Singh has that available prior to closing. Exhibit 1, Bates-labeled 130, there's a good photograph of the wood sticking out, pushing out on the side of the house where the tree fell down. Ms. Munsinger said in 2019 or 2020 or 2021, whenever she was out there, that bulkhead, the wooden portion was pushing out. That was in plain sight. Mr. Singh testified – this is not in dispute – prior to closing, he went and did his own inspection, his own walk-through of the property. There's no way he didn't see that bulkhead pushing out. Mr. Singh, prior to closing, in reliance on the representation of the potential damage to the bulkhead, sent his project manager there. The project manager did an inspection and found no damage. Why is that important? Because that goes to

14

show that either, A, there was no damage, and if the project manager can't see it, how is Mr. Ahmed going to know? I heard no testimony, no damage that there was any effects, any problems in the house: doors wouldn't close right, there's cracks in the ceiling, foundation issues, things that maybe would show Mr. Ahmed knew something that he wasn't telling or something. None of that was before us. We have red flags. We have a sophisticated real estate developer. There is, as a matter of law, no justifiable reliance.

Causation was another thing brought up. Even if there were viable damages, which there are not in this case, Mr. Singh testified – this is per his testimony – he waited until after he closed to perform, key words, due diligence. Mr. Singh testified he waited until after he closed to perform due diligence. He said that he had six months. Right away he was – he wasn't going to work on or fix any of the issues that he was disclosed until after he moved in. He testified he had at least six months of invoices. All that time, the property's getting worse and we have these photographs. Worse and worse and worse and worse. To this day, it is not fixed. We have a photograph from March of 2024, March of 2024, which shows the damages are even worse than they were before.

We don't have the proper damage model. We don't have justifiable reliance. We don't have any expert opinions in this case. We don't have any misrepresentations. We have causation issues. The damages were caused – and not that this is a contributory negligence case, but to show that there are intervening causes which were shown by Mr. Singh's inaction on the property when there were visible signs.

So for these reasons, I am granting the directed verdict on all causes of action.
The trial court also issued the following written Order Granting Defendant's

Motion for Directed Verdict:

**Seven weeks prior to closing, Defendant told Plaintiff "*THE BULKHEAD NEEDS REPAIR*"**

I. *HISTORY*
  On November 1, 2022, Plaintiff sued Defendants alleging numerous causes of action including, DTPA violations, Common

15

Law Fraud, Fraud in a Real Estate Transaction, Civil Conspiracy, Negligence, and Negligent Misrepresentation. On February 16, 2023 Defendants answered with a general denial. The Court called this case to trial on June 3, 2024 with both Plaintiff and Defendants appearing personally and through Counsel. Both sides announced "ready" and the Court empaneled and swore in a jury of twelve with one alternate. Plaintiff put on his case by calling himself, a contractor, an engineer, one of the Defendants and Plaintiff's counsel for fees. Plaintiff rested his case on June 4, 2024 and Defense Counsel moved for a directed verdict on all of Plaintiff's causes of actions, attacking every essential element. Plaintiff agreed to withdraw his conspiracy and negligence causes of action.

II. *UNCONTESTED FACTS*
In early March of 2021[,] Plaintiff was interested in purchasing a 9,306 square foot, custom built, waterfront mansion on Lake Conroe from Defendants located at 28844 Oaks on the Water, Montgomery, Texas 77356 (hereafter the "Property") for $1,795,000. Defendants, husband and wife, were the original owners and lived on the Property since 2011. At the time of these negotiations[,] Plaintiff represented himself as he was a real estate broker who had experience buying and selling multiple million dollar properties. Defendants were represented by a broker from MHW Brokerage Services.

On March 2, 2021[,] Plaintiff received Defendants' Sellers' Disclosure Notice that failed to reference any knowledge regarding bulkhead repairs (see Exhibit 3, pp D-0021 – D-0026). A month later and seven weeks prior to closing, on April 2, 2021, Plaintiff received notice from the Defendant Husband through text message that the bulkhead may need upwards of $60,000 worth of repair (See Defense Exhibit 2). Additionally, Plaintiff testified that Defendant Husband told him "***the bulkhead needs repair.***" On April 2, 2021[,] Plaintiff not only became aware that the bulkhead on the waterfront mansion needed repair, but that the Defendants had failed to properly and accurately disclose this in the March 2, 2021 Sellers' Disclosure Notice.

16

After becoming aware of the inaccurate disclosure and need for bulkhead repair, Plaintiff ordered his project manager to inspect Defendants' property. Defendants allowed Plaintiff's project manager full access to conduct his inspection. Plaintiff's project manager saw the condition of the Property during his inspection, including a portion of the bulkhead that was pushed out as well as a missing tree near the damaged bulkhead. Plaintiff's project manager reported these findings to Plaintiff and informed Plaintiff that these damages were not out of the ordinary and that he could get this taken care of.

Instead of insisting the Defendants repair the damaged bulkhead prior to closing or having his own project manager 'take care of' the damaged bulkhead, Plaintiff renegotiated the sale of the home. During this renegotiation, Plaintiff learned that just two months prior to his contract, Defendants had another sale fall through. Defendants provided Plaintiff with the prior potential buyer's inspection report dated January 2021. Plaintiff testified that he reviewed the January 2021 inspection report and that it showed no issues with the bulkhead or the home. Plaintiff chose to forego the hiring of his own inspector, and instead chose to rely on this previous potential buyer's inspection report. With the delivery of the January 2021 inspection report from Defendants, Plaintiff once again became aware of the inaccuracy of another portion of the Sellers' Disclosure Notice, that being Defendants' statement in the Disclosure that they were not in receipt of any inspection reports within the last four years (see section 10 of Exhibit 3, page D-0025). Plaintiff also testified that prior to closing, Defendant Husband disclosed to Plaintiff that Defendants previously replaced the stairs to the deck. Plaintiff personally visited the Property and saw the condition it was in prior to closing.

Despite spending eleven weeks negotiating the purchase of the Property, seven weeks becoming aware of the need for expensive bulkhead repair as well as the inaccuracies in the Sellers' Disclosure Notice, not to mention learning of the prior failed sale and stair replacement, Plaintiff agreed to purchase Defendants' Property on May 21, 2021 for $1,795,000.00. Plaintiff made the decision to purchase this waterfront mansion without first

repairing the bulkhead. Plaintiff made the decision to enter into a Non-Realty Items Addendum that conveyed Defendants' Mercury Boat and Trailer to Plaintiff in lieu of the bulkhead repair (See Exhibit 3, p. D-0020). Plaintiff testified the Mercury Boat was valued around $100,000.00 Plaintiff made the calculated decision to take it upon himself to do the bulkhead repairs *after* closing, *accepting the burden of repair*, in exchange for a $100,000.00 boat.

Once the baton of ownership was passed to Plaintiff, the Property value increased by half a million dollars. Exhibit 10 shows the April 5, 2022 appraised value for the Property increased to $2,275,910. It wasn't until after Plaintiff failed to conduct any repairs on the bulkhead for over a year that the condition of the Property worsened. Plaintiff testified he delayed the start of his due diligence in repairing the bulkhead for another five to six months after purchasing the Property. For half a year Plaintiff did nothing to remedy the bulkhead. Plaintiff testified it wasn't until October or November of 2021 that he began his due diligence in looking for and talking to contractors about the repair of the bulkhead. Plaintiff testified for the next eight months, from October 2021 to June 2022, he was getting estimates and opinions on repairing the bulkhead without the commencement of any actual physical work to fix the bulkhead. Plaintiff testified he delayed the beginning of work because he wanted it done right. Although Plaintiff testified he received numerous estimates and invoices for repair, not a single estimate from a single contractor was ever admitted before the Jury.[1] Although

---

[1] Plaintiff attempted to introduce a contractor invoice from Lake Conroe Marine Construction, LLC dated July 18, 2022 through Witness Kimberly Munsinger. The Court excluded said invoice and any expert opinions from Ms. Munsinger as her opinions were not properly filed nor disclosed [i[.e.,] the opinion of condition of property while Defendants owned property in 2019, that there were prior repairs made, and the opinion of diagnosis and scope to fix the problems in 2019], nor was all the evidence she relied upon produced [photographs she took of the Property during her inspection when Defendants owned the Property]. Munsinger's testimony was limited to that of a lay witness and stated the condition of the Property when Defendants owned it: a pushed out section of the bulkhead and cracks in decking, similar to what Plaintiff and Plaintiff's project manager witnessed

18

Plaintiff accepted the Burden of repair he admitted on cross examination that at the time he resold the Property he failed to make a single repair. For the entire twenty-seven months Plaintiff owned the Property[,] he watched as the damage intensified and did nothing to stop the bleeding.

The various pictures of the Property that were admitted into evidence document the degrees of destruction that were exacerbated under Plaintiff's control and ownership. Photos from June 2022, September 2022, December 2022, and even March 2024 show while Plaintiff failed to conduct any repairs after accepting the burden of repair, the Property condition worsened. On September 1, 2023, Plaintiff sold the Property to a subsequent buyer with a $750,000 credit after Plaintiff failed to make a single repair causing the Property condition to deteriorate and market value to plummet. Plaintiff testified he sold the Property to someone who could give the Property more attention.

III.  *LEGAL STANDARD*

A directed verdict is proper when reasonable jurors cannot decide an issue required in a verdict. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). It is the same test as that for judgments notwithstanding the verdict, summary judgments and no-evidence appellate reviews. *Id.* If reasonable minds could not differ in their conclusions, then the evidence is conclusive and a directed verdict is required. *Id.* at 816; *Wood v. Pyramid Community Development Corporation,* 14-11-00428-CV (Tex. App.—Houston [14th Dist.] June 26, 2012, no pet.). The Court uses a legal sufficiency standard which must be sustained when any of the following is true:

(1) There is a complete absence of evidence regarding a vital fact,
(2) The rules of law or evidence preclude according weight to the only evidence offered to prove a vital fact,

---

prior to closing. She also testified that Defendants called her out to get an estimate for repair to the bulkhead and that she provided Defendants with an estimate for such repairs, an estimate she never produced with no memory of its particulars as she claims it vanished when the company changed software after the death of the prior owner.

19

(3) The evidence offered to prove a vital fact is no more than a scintilla, or

(4) The evidence conclusively establishes the opposite of the vital fact.

*Keller*, 168 S.W.3d at 810; *City of Houston v. Proler*, 14-10-00971-CV, *4-5 (Tex. App. - Houston [14th Dist.] 5-31-2012, no pet.).

"The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Keller*, 168 S.W.3d at 827. Just as with motions for summary judgment, the Court examines the evidence in the light most favorable to the non-movants and determines "whether there is any evidence of probative value to raise a material fact issue on the question presented." *Krobar Drilling v. Ormiston*, 01-10-01016-CV, *4 (Tex. App. - Houston [1st Dist.] 5-3-2012) (citing *Bostrom Seating, Inc. v. Crane Carrier Co.*, 140 S.W.3d 681, 684 (Tex. 2004)). Deciding what a reasonable juror could find may be difficult in that "reasonable people sometimes disagree; thus, it is also inevitable that they will sometimes disagree about what reasonable people can disagree about." *Keller*, 168 S.W.3d at 827. But even if the decision is difficult, if the Court concludes that no reasonable juror could make a required finding, then it becomes constitutionally imperative for the Court to grant a directed verdict.

IV.   *LEGAL ANALYSIS*

Applying the law to the facts of the case the Court has no choice but to Grant the Directed Verdict as a matter of law as there is no evidence (or insufficient evidence) upon which any reasonable juror could find, or the evidence conclusively establishes the contrary for every essential element on every cause of action. Every remaining cause of action brought by Plaintiff against Defendants (DTPA, Fraud, and Negligent Misrepresentation) shares four similar essential elements: 1.) A false, misleading, deceptive representation (affirmative or by nondisclosure), 2.) Relied on by Plaintiff, 3.) Causing, 4.) Damages.

20

*A. No Misrepresentation*

Plaintiff's theory was Defendant failed to disclose and/or partially disclosed the condition of the Property. Plaintiff relied upon Contractor Munsinger, who previously inspected the bulkhead when Defendants owned the Property. Weighing the testimony of Munsinger in the light most favorable to Plaintiff demonstrates Munsinger saw a pushed out bulkhead with cracks and a missing tree and informed Defendants they needed to repair it. There was no evidence of the amount of the repair or a copy of the invoice she drafted back in 2019 she claims was provided to Defendants[.[2]] Not only was this the precise condition of the Property (pushed out bulkhead, cracks, and missing tree) when inspected by Plaintiff and his project manager, it was the precise disclosure Plaintiff testified he received from Defendant Husband, seven weeks prior to closing that "the bulkhead needs repair."

There was no evidence admitted that showed Defendants were aware of any other condition other than the pushed out bulkhead, cracks, and a missing tree. There was no evidence that the interior of the home was creaking, cracking, or failing in any way. There was no evidence that the estimated $60,000 to $100,000 of repair from Defendants to Plaintiff was false or inaccurate. *Plaintiffs failed to prove any amount of repair from April 2, 2021 when Plaintiff became aware the Bulkhead needed repair.* There was no expert testimony that demonstrated the pervasiveness of damages, causation of injury, not timeline of destruction. Plaintiff failed to prove any misrepresentation about the condition of the Property as a matter of Law and as such the Court must Grant the Directed Verdict.

*B. No Reliance*

The evidence weighed in light most favorable to the Plaintiff conclusively establishes Plaintiff did not actually and

---

[2] Defendant Husband testified he never had Munsinger come out to the Property, nor received an invoice from her. However, for purpose of this analysis, the Court must accept Munsinger's testimony as true and disregard Defendant's contrary statement.

justifiably rely on any misrepresentation from Defendants. As previously stated[,] there was no misrepresentation to rely on. Even if there was, the circumstances definitely show Plaintiff's reliance was not justified. "Whether Plaintiff's reliance is justifiable is usually a fact question, but the element may be negated as a matter of law when circumstances exist under which reliance cannot be justified."[3] In an arm's length transaction, Plaintiff may not blindly rely on an assumption that the Defendant's statements are truthful, but must exercise ordinary care to protect his own interests.[4] The Plaintiff is presumed to know any facts that would have been discovered by a reasonable prudent person in the same or similar circumstances.[5] Moreover, Plaintiff has a duty to use ordinary care and reasonable diligence to protect their interest if they are aware of information – red flags – that would lead a reasonable prudent person to investigate and are not justified in relying solely on Defendants' representations.[6] Plaintiff's personal characteristics and abilities is another factor Courts use to determine whether Plaintiff's reliance was justifiable.[7] "Either numerous red flags or direct contradiction in [the] transaction between sophisticated parties alone would [be] sufficient to negate justifiable reliance as a matter of law."[8]

Here, Plaintiff was a sophisticated Party, a real estate broker that had experience buying and selling numerous million dollar properties prior to the transaction in this case. Although Plaintiff and Defendants were acquaintances, they had no prior business dealings and were not family, making this an arm's length transaction where Plaintiff had to rely on his own sophisticated experience and not that of the Defendants. Seven weeks prior to closing Plaintiff became aware of numerous red flags that would cause a reasonably prudent

---

[3] Mercedes-Benz USA v. Carduco, Inc. 2019 WL 847845 (Tex. 2018).
[4] JP Morgan Chase Bank v. Orca Assets GP, 546 SW3d 648, 654 (Tex. 2018).
[5] Id.
[6] Id.
[7] Id.
[8] Id.

purchaser (let alone a sophisticated real estate broker) of a million dollar waterfront mansion concern in relying on anything Defendants stated. As the Plaintiff renegotiated the purchase prior to closing, he became aware of even more red flags. Here are just a few of the undisputed red flags that Plaintiff knew about prior to closing on the Property:

    a. The bulkhead needed repair.

    b. Defendants failed to disclose the bulkhead repair on the Seller's Disclosure Notice.

    c. A prior sale fell through two months prior to Plaintiff's contract.

    d. Defendants failed to disclose the existence of a January 2021 inspection report on the Seller's Disclosure Notice.

    e. The Property's physical condition prior to closing in April of 2021 included a pushed out bulkhead, cracks, and a missing tree as reported by the Defendant Husband, Plaintiff's project manager's inspection, Plaintiff's personal inspection, and the January 2021 prior prospective purchaser inspection report.

    f. Defendants previously replaced the stairs on the deck.

Knowing all of these red flags, Plaintiff, a sophisticated real estate broker, decided to not only accept the burden of repair in the Non-Realty Items Addendum, he chose to delay his due diligence in repairing the bulkhead. Under this extreme set of facts[,] Plaintiff cannot as a matter of law claim to have relied on anything Defendants stated about the condition of the Property. Similar to judgment debtors with no assets being "judgment proof," Plaintiff, with his sophistication, numerous warnings, and delay in due diligence is RELIANCE PROOF.

23

*C. No Causation*

The type of causation standard depends on the type of damages sought by Plaintiff. Since Plaintiff seeks direct damages, the diminution of market value in the Property, he only has to show the misrepresentation resulted in the damages, and not proximate cause as the foreseeability of direct damages are presumed.[9] While consequential damages and DTPA damages require proximate and producing causes, the Court will focus only on the lowest causation standard as Plaintiff fails on all causes of action on this lowest causation standard.

Simply stated, Plaintiff accepted sole responsibility and chose to permanently delay the repairs. After becoming aware that the bulkhead needed to be replaced and all of the red flags that followed, Plaintiff chose to accept the burden of repair in the Non-Realty Items Addendum. By doing so, Plaintiff completely waives the source of any other potential cause. He accepted sole responsibility and chose to delay the start of his due diligence for six months, delay in performing due diligence for another eight months, and permanently delay the actual physical repair of the bulkhead for his entire twenty seven month ownership. Under Defendant's (sic) watch, the Property went from increasing in value, to bad, then to worse. The photographs entered by the Parties demonstrate the Damages Plaintiff allowed to metastasize. Plaintiff's case fails as a matter of law because no amount of damage for any cause of action resulted from a misrepresentation, but rather solely from Plaintiff's actions, or in this case, inaction.[10]

---

[9] See Scott v. Sebree, 986 SW2d 364, 371 (Tex. App. – Austin 1999, pet. Denied).

[10] The Court is not considering any affirmative defenses in this finding as it struck Defendants' late amended answer, but rather only on Plaintiff's failure to meet its own burden of proof on the elements.

*D. No Damages*

The type of compensation to be awarded for an injury to real property depends upon the nature of the injury.[11] Plaintiff stated numerous times from pretrial, to opening argument, to closing argument[,] that he sought the diminution of market value as his only damage model. A plaintiff's ability to recover damages to his property requires a consideration of the character of an injury as either permanent or temporary.[12] Damages for permanent injuries to land is the diminution in the value of the land.[13] Damages for temporary injuries is the cost to reasonably repair and restore the property to its condition immediately preceding the injury.[14] The diminution in fair market value may be the measure of damages only when the cost of restoration exceeds the diminution in fair market value.[15]

Here, Plaintiff used the wrong damage model. He tried to recover $750,000 in the diminution of value (permanent damages) when the injury to the Property was temporary. We know from contractor Munsinger that she recommended the bulkhead be repaired during both Defendants' and Plaintiff's ownership of the property. We heard that Plaintiff knew the Property needed repair and that he was looking into hiring a contractor for repairs. We heard Plaintiff's project manager say the Property needed repairs that were not out of the ordinary and he would take care of it. There is no dispute the damages here should have been proved as temporary and not permanent. As such, the Plaintiff failed as a matter of law to prove damages.

---

[11] See Atlas Chemical Industries, Inc. v. Anderson, 524 SW2d 681 (Tex. 1975).

[12] See Z.A.O., Inc. f/k/a Bell Thunderbird Oil Co., Inc. v. Yarbrough Drive Center Joint Venture, 50 SW3d 531 (Tex. App. – El Paso 2001, no pet.).

[13] See Id. See also Kraft v. Langford, 565 SW2d 223, 227 (Tex. 1978).

[14] See Id.

[15] See Mieth v. Ranchuest, 177 SW3d 296, 303-04 (Tex. App. – Houston [1st Dist.] 2025, no pet.).

25

During the Plaintiff's testimony[,] he tried to elicit "backdoor" evidence as to the amount that contractor Munsinger guessed it may have cost to repair the bulkhead in 2019 after the Court excluded said testimony.[16] However, at no time did the Plaintiff present evidence from any witness that any cost of repair was reasonable and necessary.[17] There was also no evidence presented by the Plaintiff as to the cost of reasonable and necessary repairs to restore the Property *at the time* Plaintiff became aware of the need for repairs: April 2, 2021.

Even if permanent damages were the correct measure, Plaintiff failed to properly prove the loss in market value at the time Plaintiff became aware of the need for repairs: April 2, 2021. During Plaintiff's testimony[,] he tried to elicit an opinion that the value of his Property decreased by $750,000 from his subsequent sale that occurred on September 1, 2023, *twenty seven months after* Plaintiff became aware of the damaged bulkhead. The market value of the property may be determined by a fair resale . . . within a reasonable time after the breach.[18] Plaintiff had the burden to show that twenty seven months was within a reasonable time frame, but he failed to elicit any testimony regarding this gap in time. Although Plaintiff was a sophisticated real estate broker, he failed to state whether there were any fluctuations in market conditions for those twenty seven months.[19] "Recent events

---

[16] As referenced earlier, the Court excluded contractor Munsinger's opinions as they were not properly filed nor disclosed. During a voir dire/offer of proof of [M]u[]nsinger outside the Jury's presence[,] she stated she could not remember the amount she quoted Defendants back in 2019 and guessed it may have been around $400,000 to $500,000. She never testified this amount was reasonable and necessary as required by McGinty v. Hennen, 372 SW3d 625 (Tex. 2012); Mustang Pipeline Co. v. Driver Pipeline Co, 134 SW3d 195 (Tex. 2004); Dall. Ry. & Terminal Co. v. Gossett, 156 Tex. 252 (1956); Bavarian Autohaus, Inc. *V. Holland*, 570 SW2d 110 (Tex. Civ. App. – Houston [1st Dist.] 1978; *Bradley v. Castro*, 591 SW2d 304 (Tex. Civ. App. – Fort Worth, 1979, no writ).

[17] As required by Id.

[18] See Kempner v. Heidenheimer, 65 Tex. 587, 591 (1886).

[19] See Barry v. Jackson[,] 309 SW3d 135, 140 (Tex. App. – Austin, 2010).

26

in the nationwide real estate market show without a doubt that one year can make an enormous difference in the value of real estate, and Texas courts have recognized this fact."[20] Here, there was evidence of fluctuations in the market. Exhibit 10 shows that within one year of purchasing the Property, the April 5, 2022 appraised value of Plaintiff's Property increased by half a million dollars. Plaintiff never testified what the fluctuations mean. Despite being a sophisticated real estate broker, Plaintiff failed to offer any evidence on comparable sales with and without damaged bulkheads. Since the Plaintiff failed to put on any evidence of the proper, temporary damage model, or an adequate permanent damage analysis, the Plaintiff's case fails as a matter of law.

V.     *CONCLUSION*
The Plaintiff has provided no evidence (or insufficient evidence) upon which any reasonable juror could find, or the evidence conclusively establishes the contrary, for every essential element for DTPA, Fraud, and Negligent Misrepresentation. It is, therefore ORDERED that all of Plaintiff's causes of action are dismissed with prejudice as a matter of law. All costs to be borne by Plaintiff. This Order is final, disposing of all claims and Parties and is appealable.

SO ORDERED: 6/7/2024 10:01:42 AM

Vincenzo J. Santini, Judge Presiding

**ANALYSIS**

Issue One: Directed Verdict and Sufficiency of the Evidence

In his first issue, Singh argued that the trial court erred in granting a directed verdict, because the evidence was "legally sufficient to support" his causes of action

---

[20] See Id.

27

alleging DTPA violations, common law and statutory fraud, and negligent misrepresentation.

We review a trial court's decision on a motion for directed verdict de novo, using the same standard of review as a legal sufficiency, or no-evidence, challenge. *See JPMorgan Chase Bank, N.A. v. Orca Assets, G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018); *City of Keller*, 168 S.W.3d at 823. The legal sufficiency test is the same in directed verdicts as in summary judgments and judgments notwithstanding the verdict: we consider the evidence in the light most favorable to the nonmovant's case. *See City of Keller*, at 823-24. Therefore, a directed verdict is proper if the record reflects: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810. As the trial court observed, "[t]he final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827.

Singh does not dispute that he purchased the property "as is," but contends that exceptions to an "as is" purchase apply, enabling him to avoid the effects of an "as is" provision in the contract. Specifically, Singh argues on appeal, as he did in

the trial court, that the Ahmeds may not rely on the "as is" clause, because the Ahmeds misrepresented or fraudulently concealed the condition of the property.

When a buyer agrees to purchase something "as is," he agrees to make his own appraisal of the bargain and to accept the risk that he may be wrong. *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995) (citation omitted). When determining the enforceability of an "as is" clause, we consider the nature of the transaction and the totality of the circumstances, including whether (1) the "as is" clause is an important part of the basis of the bargain, not an incidental or boilerplate provision, (2) the parties are sophisticated, of relatively equal bargaining position, (3) the contract was freely negotiated, and (4) the contract was an arm's-length transaction. *Id.* at 162. Unless exceptions apply, an "as is" agreement negates a buyer's claim that the seller caused his injury. *Id.* at 161. Exceptions to an "as is" agreement include a seller's fraudulent representation or concealment of information. *Id.* at 162. A seller similarly may not enjoy the protection of "as is" language if he has impaired the buyer's ability to inspect the property. *Id.*

In this case, the trial court applied the no-evidence standard to find that Singh offered no evidence of some of the elements of his causes of action. Singh's remaining causes of action have certain elements in common: misrepresentation, reliance/causation, and damages. *See id.* at 160-61. Absent evidence of any of these elements, Singh's claim must fail. *See id.* We therefore examine the Ahmeds'

knowledge of the condition of the property and the information the Ahmeds provided Singh before the May 21, 2021 closing date to determine whether it supports Singh's allegations.

The record discloses that in their April 5, 2021 Seller's Disclosure Notice, the Ahmeds did not disclose any bulkhead damage and also omitted any reference to having received an inspection report from a previous potential buyer. Since Munsinger's testimony, viewed in the light most favorable to Singh, shows that the Ahmeds knew that an area of the bulkhead was damaged, and since other testimony shows that Ahmed gave Singh an inspection report from earlier in 2021, Ahmed did fail to disclose these matters on his Seller's Disclosure Notice. *See* Tex. Prop. Code Ann. § 5.008; *see also Hall v. Rogers*, No. 01-19-00408-CV, 2021 Tex. App. LEXIS 5143, at *16, 20 (Tex. App.—Houston [1st Dist.] June 29, 2021, pet. denied) (mem. op.). These omissions, however, do not support Singh's arguments of actionable misrepresentation, since Singh could not have relied on them, despite his contrary testimony. Singh testified that he relied on the Ahmeds' Seller's Disclosure Notice and the prospective buyer's inspection report and would not have bought the property had these documents shown the pool, retaining wall, and bulkhead issues that appeared later. Ahmed, however, disclosed bulkhead damage in a text message to Singh and disclosed the existence of the inspection report by giving it to Singh.

30

Singh therefore cannot use the inaccurate Seller's Disclosure Notice to support his case.

According to the Seller's Disclosure Notice and section 5.008 of the Texas Property Code, a seller need disclose only those conditions known to the seller as of the date of the notice. Tex. Prop. Code. Ann. § 5.008(b). The Seller's Disclosure Notice states, in compliance with the Property Code:

> THIS NOTICE IS A DISCLOSURE OF SELLER'S KNOWLEDGE OF THE CONDITION OF THE PROPERTY AS OF THE DATE SIGNED BY SELLER AND IS NOT A SUBSTITUTE FOR ANY INSPECTIONS OR WARRANTIES THE BUYER MAY WISH TO OBTAIN. IT IS NOT A WARRANTY OF ANY KIND BY SELLER, SELLER'S AGENTS, OR ANY OTHER AGENT.

*See id.*

Neither the Seller's Disclosure Notice nor the Texas Property Code requires a seller to disclose a condition unknown to him. *See Prudential Ins. Co.*, 896 S.W.2d at 162-63. Singh has cited no authority requiring a seller to disclose a condition that may develop in the future. Therefore, if a seller is unaware of a property condition, he need not disclose it. *See Hall*, 2021 Tex. App. LEXIS 5143, at **13-15.

Singh claims that the Ahmeds fraudulently failed to disclose the pool and bulkhead issues that later became apparent. However, there was no evidence to show that the Ahmeds knew that the bulkhead and pool might later require repairs costing a total of $654,000. Although Munsinger testified that she assessed the bulkhead damage and gave the Ahmeds a repair quotation, the record does not show that she

31

evaluated more of the bulkhead than the pushed-out section or that she told the Ahmeds it would cost more than $60,000 to repair that damage.[21] On this record, it cannot be said that the Ahmeds were aware of more bulkhead damage than they disclosed or that the repair cost would exceed $60,000.

The evaluation by Singh's project manager further undermines Singh's allegation of detrimental reliance on the Ahmeds' disclosures. Since the project manager inspected the pushed-out portion of the bulkhead and told Singh he could "get this taken care of[,]" Singh relied on his project manager, not the Ahmeds, regarding the bulkhead issue. *See Grove v. Franke*, No. 09-18-00119-CV, 2019 Tex. App. LEXIS 9165, at *13 (Tex. App.—Beaumont Oct. 17, 2019, pet. denied.) (mem. op.).

We have previously considered and rejected arguments similar to Singh's. *See generally Hall*, 2021 Tex. App. LEXIS 5143, at *20; *Grove*, 2019 Tex. App. LEXIS 9165, at *17. In both *Hall* and *Grove*, the house buyers sued the sellers, contending that alleged failures to disclose property conditions constituted DTPA violations, statutory and common-law fraud, fraudulent inducement, and negligent misrepresentation. *Hall*, 2021 Tex. App. LEXIS 5143, at **2-3; *Grove*, 2019 Tex. App. LEXIS 9165, at **8-12. In affirming the trial courts' directed verdict in *Hall*

---

[21] Although Munsinger stated that she assessed over 200 feet of bulkhead and that it would cost $400,000 to $500,000 to repair, the trial court excluded this expert testimony on the basis that Munsinger's opinion was not properly disclosed.

32

and summary judgment in *Grove*, we reviewed the *Prudential Insurance Company* factors in light of the "as is" contract provisions and determined that the records revealed no evidentiary grounds to avoid the "as is" sale. *Hall*, 2021 Tex. App. LEXIS 5143, at **11-13, 20; *Grove*, 2019 Tex. App. LEXIS 9165, at **9-14.

Here, as the trial court found, Singh was an experienced real estate investor who relied on his project manager's evaluation of the bulkhead damage. Also, the sales contract between Singh and the Ahmeds was freely negotiated and the parties possessed relatively equal bargaining power. Additionally, the "as is" clause in the contract was not an incidental or boilerplate contractual provision, since the contract "provided two options from which the parties could choose, and [buyer] agreed to accept the property in its present condition." *See Grove*, 2019 Tex. App. LEXIS 9165, at **9-10. Such a choice is, by definition, not boilerplate. *Id.* (citing *Van Duren v. Chife*, 569 S.W.3d 176, 187 (Tex. App.—Houston [1st Dist.] 2018, no pet.]. Since the Ahmeds satisfied the *Prudential* criteria for enforcing an "as is" clause, and since Singh produced no evidence that the Ahmeds fraudulently concealed information known to them, fraudulently induced Singh to enter the contract, or prevented Singh from inspecting the property, the "as is" clause is enforceable. *See Prudential Ins. Co.*, 896 S.W.2d at 161-64.

As for the damage element of Singh's claims is concerned, the correct measure of damages for damage to real property depends on whether the damage is

33

temporary or permanent. *See Gilbert Wheeler, Inc. v. Enbridge Pipelines (E. Tex.), L.P.*, 449 S.W.3d 474, 476 (Tex. 2014). If the damage is temporary, then any damages awarded are "commensurate with the cost of restoring [the] property, but when an injury to the same property is permanent," any damages would be measured by "the loss in the fair market value to the property as a whole." *Id.* The *Gilbert Wheeler* Court differentiated between temporary and permanent damage, stating:

> An injury to real property is considered permanent if (a) it cannot be repaired, fixed, or restored, *or* (b) even though the injury can be repaired, fixed, or restored, it is substantially certain that the injury will repeatedly, continually, and regularly recur, such that future injury can be reasonably evaluated. Conversely, an injury to real property is considered temporary if (a) it can be repaired, fixed, or restored, *and* (b) any anticipated recurrence would only be occasional, irregular, intermittent, and not reasonably predictable, such that future injury could not be estimated with reasonable certainty.

*Id.* at 480.

If, however, the cost of repair disproportionately exceeds the diminution in the value of the property, then a temporary injury may be considered permanent pursuant to the economic feasibility rule. *Id.* at 481-82. In that event, the damages would be measured by the reduced property value rather than the cost of repair. *Id.*

Although the Ahmeds did not damage Singh's property in the sense that the Ahmeds did not enter the property after the sale and cause damage, we have used the above approach to determine the proper measure of damages due, if any, under analogous circumstances. *See Gicor, Inc. v. Brewer*, No. 09-21-00222-CV, 2023

34

Tex. App. LEXIS 5545, at *39 (Tex. App.—Beaumont July 27, 2023, pet. denied) (mem. op.) (citing *Gilbert Wheeler*, 449 S.W.3d at 481).

Had Singh avoided the "as is" contract term and prevailed on any of his theories of recovery, the next inquiry would be whether the damages to the property were permanent or temporary. Although the trial court considered both possibilities, negating Singh's possible recovery regardless of the temporary or permanent nature of the injury, we believe that the ability to repair the damage, as Gultek indicated when he testified that his company designed a repair plan and did work at the property, means that the damage was temporary. The damage therefore would be measured by the reasonable cost of necessary repairs unless those costs greatly exceed the property's value reduction. Since the projected repair cost is $654,000, and that amount is below the amount Singh believed the property value declined, Singh's recovery, if any, would be limited to the $654,000 repair cost, provided that this amount could be proven to be reasonable and necessary. *See McGinty v. Hennen*, 372 S.W.3d 625, 627-29 (Tex. 2012) (requiring evidence of reasonableness and necessity of repair costs sought in the context of a construction contract). Since the record shows no evidence that the projected repair costs for either the bulkhead or the pool are reasonable and necessary, there is no evidence of Singh's damages. *See id.*

We overrule Singh's first issue.

Issue Two: Singh's Expert Disclosure

Singh's second issue claims that the trial court erroneously excluded Munsinger's expert testimony and that this ruling "was an abuse of discretion that amounted to a death penalty sanction."

We review a trial court's ruling on the admission of evidence under an abuse of discretion standard of review. *See Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347 (Tex. 2015) (citations omitted). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner, or if it acts without reference to any guiding rules or principles. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). We will uphold the trial court's decision if it is within the zone of reasonable disagreement. *Windrum v. Kareh*, 581 S.W.3d 761, 770 (Tex. 2019) (addressing an allegedly conclusory expert opinion).

The trial court excluded Munsinger's expert testimony as to the scope and cost of the bulkhead repair because Singh did not properly disclose Munsinger's opinion as required by the DCO. In the trial court's words, Singh's expert designation did not comply with the DCO because it did not state, "Here are my opinions back in 2019, 2021. I went out there and inspected[.] Here's what we found and here's what we said would remedy it."

We confronted a similar situation in *Fults v. Standley*, No. 09-22-00126-CV, 2025 Tex. App. LEXIS 5653, at \*\*26-28 (Tex. App.—Beaumont July 31, 2025, pet.

36

filed) (mem. op.). In *Fults*, the plaintiff's expert designation stated that an expert witness would testify

> [C]oncerning the nature and extent of Plaintiff's injuries, the proximate cause thereof, their examination and treatment of Plaintiff, Plaintiff's prognosis, and the reasonableness and necessity of their medical bills, chiropractic treatments, as well as the amount and necessity of Plaintiff's future medical, chiropractic and treatment expenses and health care costs.

*Fults*, 2025 Tex. App. LEXIS 5653, at **6-7.

Relying on both its DCO and Rule 195.5, the *Fults* trial court excluded the plaintiff's expert, stating that the plaintiff's expert disclosure was inadequate. *Id.* at **16-18. We affirmed the trial court's judgment. *Id.* at *36; *see also In re Ybarra*, No. 09-22-00212-CV, 2022 Tex. App. LEXIS 6338, at **10-12 (Tex. App.—Beaumont Aug. 25, 2022, no pet.) (mem. op.). "The purpose of this pretrial disclosure rule is to give the opposing party sufficient information about the expert's opinions to prepare to cross-examine the expert and to prepare expert rebuttal evidence." *Miller v. Kennedy & Minshew*, 142 S.W.3d 325, 348 (Tex. App.—Fort Worth 2003, pet. denied.).

Here, the trial court made a similar ruling for a similar reason. Rule 195.5(a)(3) requires disclosure of "the general substance of the experts mental impressions and opinions and a brief summary of the basis for them[.]" Tex. R. Civ. P. 195.5(a)(3). The trial court's DCO went farther, requiring not only the information required by the foregoing Rule, but the opinions to be offered by each expert. In

37

addition, the DCO cautions that a Rule 195 disclosure will not satisfy the disclosure requirements of the DCO. The Ahmeds' counsel objected that Singh's disclosure failed to include Munsinger's opinions and thus did not "g[i]ve us the impression that we need[ed] to depose this witness or get a rebuttal witness for this witness." In other words, Singh's disclosure failed to give the opposing party sufficient information about the expert's opinions to prepare to cross-examine the expert and to prepare expert rebuttal evidence. *Miller*, 142 S.W.3d at 348.

Since Singh's expert disclosure provided only a general description of the subjects on which Munsinger would testify--and did not include a summary of Munsinger's opinions, the opinions, or the basis for those opinions, so as to enable the Ahmeds to prepare to cross-examine or rebut that proposed expert testimony--the trial court was within its discretion in excluding the expert portion of Munsinger's testimony. We conclude the trial court did not abuse its discretion in making this ruling. We overrule Singh's second issue.

## CONCLUSION

Having overruled both of Singh's appellate issues, we affirm the trial court's judgment.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on March 31, 2026
Opinion Delivered May 21, 2026

Before Golemon, C.J., Johnson and Wright, JJ.